Max D. Klahr and Sophia S. Klahr v. Commissioner.
Klahr v. Commissioner
Docket No. 5026-64.
United States Tax Court
T.C. Memo 1968-245; 1968 Tax Ct. Memo LEXIS 54; 27 T.C.M. (CCH) 1293; T.C.M. (RIA) 68245; October 23, 1968. Filed F. Wendell Lensing and Maurice C. O'Connor, 500 N. Weinbach Ave.,Evansville, Ind., for the petitioners. Dennis J. Fox, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax for the years and in the amounts as follows: Year
Deficiency
Addition to tax undersection 6653(b) [1]
1955
$1,626.52
$ 818.06
1956
1,339.05
669.53
1957
2,562.20
1,281.10
The issues for decision herein are: (1) Whether petitioners are chargeable with taxable income in the years 1955, 1956, and 1957 by virtue of the husband's receipt of certain sums in exchange for his promissory notes *55 obtained in connection with a series of fraudulent schemes by the husband in those years. (2) Whether petitioners, husband and wife, are both precluded from denying the imposition of the additions to tax for fraud for the years 1955, 1956, and 1957 by virtue of the husband's criminal conviction for those years under section 7201. (3) Whether any part of the underpayment of tax for each of the years 1955, 1294 1956, and 1957 was due to fraud by the husband. Findings of Fact Some of the facts have been stipulated and are found accordingly. [2]
*56 Max D. Klahr and Sophia S. Klahr are husband and wife with their principal residence in Evansville, Indiana. They filed their Federal joint income tax returns for the years 1955 through 1957 with the district director of internal revenue, Indianapolis, Indiana. Because Sophia S. Klahr is a party to this proceeding only because she filed joint returns for the years in issue, Max D. Klahr will hereafter be referred to as petitioner. Bit O' Santa Claus Promotion During 1955, petitioner was employed by an oil reporting service and then, for approximately 4 weeks, as the manager of a small restaurant known as the Spaghetti Bowl. His estimated receipts from both jobs were approximately $450. During September 1955, while petitioner was still employed at the Spaghetti Bowl restaurant, an acquaintance, Robert Stone (hereinafter referred to as Stone), approached petitioner with a business proposition. The proposition involved the purchase of land in the City of Santa Claus, Indiana. The land would then be divided into small square-inch portions with printed deeds to those portions to be sold to retail merchants for use as a promotion or advertising scheme during the Christmas season. *57 Shortly after their meeting, Stone and petitioner went together to Santa Claus, Indiana, to look for suitable land. Thereafter, Stone acquired approximately 2 acres of land in that area. Stone then told petitioner the venture was ready if petitioner would agree to help promote it. Petitioner agreed but stated that he did not have sufficient money, whereupon Stone offered to lend petitioner the money provided he gave a note for its repayment. Petitioner and Stone then organized the Bit O' Santa Claus Indiana Land Corporation with petitioner as its president and Stone as its secretary-treasurer. Thereafter, beginning in October 1955, a general pattern of dealings between Stone and petitioner developed. Petitioner would receive an advance of money from Stone, giving a note in exchange therefor. Ten days to 2 weeks later, petitioner would report his alleged activities during the period just passed to Stone. Petitioner would then advise Stone that the previous advance had been exhausted and would receive a further advance, giving another note in exchange. These dealings can be summarized as follows: Approximate date
Alleged activities of petitioner
Amount ofadvance
10/17/55
$2,500
10/31/55
Trip to New York City; visits to following department stores: Macy's, Gimbel's, and Bloomingdale's
[1] 1,500
11/14/55
Trip to New York City; visits to Macy's buying office, Gimbel's, and Bloomingdale's
[1] 1,000
11/24/55
Trip to New York City; visits to Macy's, Gimbel's, Blooming- dale's, Abraham and Strauss, and other stores in Brooklyn
n1 1,000
12/ 4/55
Trip to New York City; visits to General Foods Corporation and various small stores in White Plains and the Bronx
[1] 1,000
12/14/55
Trip to New York City, visits to the advertising agency ofGeneral Foods, Gentz Department Store, and other stores in Jamaica, Long Island
*58 1295 In June 1956, petitioner met with James Angermier (hereinafter referred to as Angermier), the Evansville attorney who had earlier helped to incorporate the Bit O' Santa Claus Indiana Land Corporation. At that meeting, petitioner told Angermier that General Foods was interested in the Bit O' Santa Claus idea and that they had already given it legal approval and would very shortly decide whether they would accept it. On the basis of these representations, Angermier purchased four shares of Bit O' Santa Claus stock from petitioner for $400. In August 1956, Angermier sent a letter to General Foods Corporation seeking verification of petitioner's activities in connection with that corporation regarding the Santa Claus promotion. At that time, an attorney in the law department of General Foods Corporation conducted a search for references to petitioner or the Santa Claus promotion in the following areas of that corporation's activities, *59 which areas were the most likely to have been involved in the matter: corporate marketing section; public relations department; legal department; and Post Cereals Division promotion department. No records, references, or other information relating to either petitioner or the promotion were obtained by this search. In February 1960, petitioner was interviewed by a special agent of the Internal Revenue Service. At that interview, petitioner told the special agent that he had received only $4,500 from Stone; that he could not furnish the names of any individuals whom he had contacted with respect to the land promotion scheme; that the reason for the execution of the $4,500 note was to furnish Stone evidence to be used by him in claiming a bad debt deduction; and that he had no records of any expenses he had incurred in connection with the land promotion. In 1962, at the request of the United States Department of Justice, searches of the files and records of the following companies were made by various employees of those companies in order to find any information or record of petitioner or the Santa Claus promotion. [3]
*60 Company
Departments or divisions whose records were searched
Title of employee supervising search
General Foods Corp.
Advertising services department; Jello division; Bird's- Eye division; institutional products divison; and pur- chasing department.
Special projects manager
Gimbel's Dept. Store
Publicity department; legal department; controller's office.
Assistant controller
Bloomingdale's Dept. Store
Legal department; publicity department; and toy de- partment.
Systems and research assistant
B. Gertz, Inc.
Store correspondence files.
Assistant to the controller
Abraham and Strauss Dept. Store
Legal department; promotion department; feature events department; Christmas files; and the Hemp- stead branch store records.
Legal secretary No records or information regarding either the petitioner or the Santa Claus promotion were found by any of the above searches. None of the moneys received from Stone were ever repaid by petitioner. 1296 The only income of petitioner reported on his 1955 joint income tax return was $253.75 received from the oil reporter. [4]
*61 Prestone Anti-freeze Dealings In September 1956, petitioner approached Lafayette P. Dallas (hereinafter referred to as Dallas) and Curtis Van Bibber (hereinafter referred to as Van Bibber) who operated an automobile service station in the Evansville area. Petitioner told them that he could obtain Prestone Anti-freeze as distressed merchandise in New York City for $1 per gallon and solicited an original order for 300 gallons requiring payment in advance. Periodically thereafter, he returned and advised them that the order was not sufficient for a truckload from New York and that the order would have to be increased if they still wanted the anti-freeze. They increased their orders accordingly. Petitioner's anti-freeze dealings with Dallas and Van Bibber may be summarized as follows: Approximate date
Amount received bypetitioner [1]
September 4, 1956
$ 300
September 14, 1956
600
October 1, 1956
800
October 15, 1956 600
Total
$2,300
Periodically after November 1, petitioner visited the service station and reassured *62 Dallas and Van Bibber that the anti-freeze would be coming. When no anti-freeze had arrived by January 1, 1957, Dallas and Van Bibber made inquiry of petitioner and were told that a lock strike and a warehouse fire had delayed delivery. Finally petitioner advised them that he had sent all the money they had given him to one John Diorgino (sometimes hereinafter referred to as Diorgino) in New York but that Diorgino had been caught with stolen merchandise in Ohio and had had to leave the country and could not be gotten in touch with. Dallas and Van Bibber never received any of the anti-freeze they ordered. Under threat of law suti, petitioner eventually returned $562.26 of the $2,300 paid to him by Dallas and Van Bibber. In September 1956, Robert Martin (hereinafter referred to as Martin), an Evansville auto supply dealer, contacted petitioner in regard to the purchase of a quantity of Prestone Anti-freeze after being advised by Dallas and Van Bidder of petitioner's special price thereon. Subsequently Martin ordered 600 gallons of anti-freeze from petitioner for $600 which was paid to petitioner with the order. On several occasions thereafter, petitioner spoke to Martin advising *63 him that more gallons would be required to fill out the truckload from New York, but Martin refused to purchase any more anti-freeze. In a telephone conversation with petitioner in November, Martin asked for his money back. Petitioner then advised Martin that he had turned the money over to someone named Diorgino in New York. Martin never obtained a refund of his money or any part of the anti-freeze he had ordered. In August or September 1956, Solomon Maurer (hereinafter referred to as Maurer), an Evansville auto parts dealer, was contacted by petitioner in connection with the purchase of Prestone Anti-freeze for $1 per gallon in large quantities. Maurer told petitioner he did not have the funds for such large purchases, but after prodding by petitioner, Maurer contacted an acquaintance and prevailed upon him to order 3,000 gallons of anti-freeze from petitioner. Maurer received the purchase price from the acquaintance and tendered it to petitioner, who haded back $600 as a commission, and promised to go to New York with the remainder to obtain the anti-freeze. Following the payment to petitioner, Maurer was periodically assured by him that the anti-freeze was in New York and *64 would be delivered at any time. Petitioner explained the delay in delivery, first by a truck strike, and then by a large fire on the dock. After repeated telephone calls from Maurer, petitioner finally told him that he had given the money to one John Diorgino in New York. In a subsequent call to petitioner's house, petitioner stated to Maurer that he might as well learn "the facts of life"; he had been "had." When Maurer asked if petitioner had taken him, petitioner replied, "Well, you're over 21; it's time you found out what life is like." Petitioner eventually refunded $350 to Maurer but never delivered the anti-freeze. Maurer obtained a judgment against petitioner for the balance of the money. 1297 During the years 1955 and 1956, the wholesale price of Prestone Anti-freeze charged by the manufacturer Union Carbide Company was $1.55 per gallon. During those years, no Prestone Anti-freeze was sold by Union Carbide for $1 per gallon. In the event any damaged Prestone Anti-freeze existed in the hands of a customer, Union Carbide's practice in 1955 and 1956 was to put the contents of the cans of anti-freeze into large drums and ship the drums back to the factory. Union Carbide *65 would then replace the anti-freeze in the hands of the merchant. This practice of replacing damaged stock with new stock applied whether the anti-freeze was sold to automotive distributors on a consignment basis or to distributors who purchased it outright. In June 1958, petitioner was interviewed by a special agent of the Internal Revenue Service. At that interview, petitioner told the agent that he had turned over the money received from Dallas, Van Bibber, and Maurer to one John Diorgino, 111 Fifth Avenue, New York City, along with $5,000 of his own money, but had received no receipts therefor. The only income of petitioner reported on his joint 1956 tax return was $1,000 received from Empire Metal Trading Company. Home Appliances Dealings In late February or early March 1957, petitioner made contact with Ed Whitehead (hereinafter referred to as Whitehead), operator of an appliance store in Evansville, Indiana. Petitioner told Whitehead that he occasionally ran into bargains in television sets, radios, and other appliances and that he had already done some business with other Evansville merchants. Subsequently petitioner and Whitehead participated in the following transactions: *66 Date
Appliance allegedly purchased
Amount received bypetitioner [1]
3/11/57
100 G.E. portable television sets at $35 apiece
$3,500
4/25/57
150 R.C.A. air conditioners; 20% down, remainder on delivery 3,300
$6,800
In both transactions, Whitehead gave petitioner a check for the amount involved and in exchange received a 10-day promissory note signed by petitioner for that amount. Subsequently petitioner visited Whitehead's office on one or two occasions to advise him that he had other merchandise available. However, Whitehead did not make any additional purchases since the portable television sets and air conditioners had not yet been delivered. Whitehead continued to inquire of petitioner as to when delivery of the above merchandise would be made. Petitioner's explanations for the delay were trouble on the docks and petitioner's attempt to obtain television sets with UHF bands for Whitehead. Finally petitioner told Whitehead that the firm he had been dealing with in New York was called American Trading Company and that he would go to New York *67 very shortly to investigate their delay in delivery. Whitehead never received delivery of any of the merchandise nor a refund from petitioner of any part of the $6,800 paid to him. In June 1957, petitioner made contact with Robert J. Schaad (hereinafter referred to as Schaad), operator of a retail appliance store in Evansville, Indiana. Petitioner advised Schaad that he had connections with a company in New York City with a large amount of surplus or distress merchandise. Subsequently Schaad and petitioner engaged in the following transactions: Date
Appliance allegedly purchased
Amountreceived bypetitioner [1]
6/25/57
150 G.E. portable television sets at $45; 100 R.C.A. record players at $30; 100 R.C.A. record players at $20
$2,350
7/ 8/57
56 Westinghouse food freezers at $155
1,736
7/25/57
50 R.C.A. portable radios at $28 280
$4,366 1298 In each of the above transactions, the amount received by petitioner represented a 20 percent downpayment by Schaad. Each transaction was evidenced by a written sales agreement between Schaad *68 and petitioner drawn up by Schaad's attorney. Paragraph 4 of each sales agreement provided that if delivery was not made within 60 days, petitioner agreed to refund the entire 20 percent downpayment. In addition, as part of each transaction, Schaad gave petitioner a purchase order on a standard form used in Schaad's appliance business. Subsequent to July 25, 1957, petitioner offered to procure other appliances for Schaad, but he declined to make any further purchases. When Schaad inquired of petitioner why no deliveries had been made, petitioner's explanations were delays in getting the merchandise off the dock in New York and family problems of petitioner. Petitioner assured Schaad that the merchandise would eventually be delivered or he would receive his money back. In September or October 1957 Schaad visited petitioner's home and conferred with him. At that time, petitioner gave Schaad the following account: that he had gone to New York City to the Latin American Export Company, the company which he had advised Schaad possessed the merchandise; that he had seen someone named Diorgino whose office was located on the premises of the Latin American Export Company; that the merchandise *69 was not available; that Diorgino refused to give him his money back and did not want to talk to him; and that this news made him so emotionally upset that he became ill while in Diorgino's office. Subsequently, petitioner advised Schaad that he was hiring attorneys in New York to sue the Latin American Export Company and that he would make good any loss Schaad had incurred. In February 1958 Schaad asked petitioner to sign notes evidencing receipt of and obligation to repay all of the money he had received from Schaad. Petitioner thereupon executed three promissory notes in the respective amounts, including interest from the time of the purchase to the date of the note, of $2,437.34, $1,791.29 and $289. Schaad never received merchandise of any kind or any refund of money from petitioner. Schaad subsequently filed suit against petitioner and obtained judgment by default, which judgment has remained unsatisfied. In February 1960, petitioner was interviewed by a special agent of the Internal Revenue Service. At that interview, petitioner reiterated his statement made in the June 1958 interview that all the money from the anti-freeze transactions was given to John Diorgino. In addition, *70 he stated that the money received from Schaad and Whitehead was also turned over to John Diorgino, 111 Fifth Avenue, New York City, again without getting any receipts. During the years 1956 and 1957, neither a John Diorgino nor a Latin American Export Company occupied any premises at 111 Fifth Avenue, New York City. At the request of the United States Department of Justice, the vice president of the American Trading Company, Inc., New York City, made a search of the company's books and records for the years 1956 and 1957 for information, records, documents, or correspondence relating to petitioner, the Latin American Export Company, or John Diorgino. No reference of any kind to any of the foregoing people or company was found. The American Trading Company has never handled domestic sales and has never sold RCA air conditioners or General Electric portable television sets. Petitioner reported no income of his own on the joint 1957 returns. General Findings Petitioner kept no books and records concerning the various transactions described in detail above. Petitioner's wife prepared the joint income tax returns for all three of the years involved herein. During those years *71 she worked as a special education teacher in the Evansville school system. The only information she had as to the income earned by petitioner was the information he gave her. Petitioner did not advise his wife of any of the business dealings described above, and she did not know any of the individuals involved in those dealings, although eventually she met Schaad through his activities on the Evansville School Board. On August 28, 1961, the Federal grand jury at Indianapolis, Indiana, returned an indictment against the petitioner containing three counts in which it was charged that petitioner did willfully and knowingly attempt to evade and defeat a large part of 1299 the income tax due and owing by him and his wife to the United States of America for the calendar years 1955, 1956, and 1957 by filing and causing to be filed with the district director of internal revenue at Indianapolis, Indiana, false and fraudulent joint income tax returns for those taxable periods in violation of section 7201. Petitioner pleaded not guilty to each count. Petitioner stood trial before the United States District Court, Southern District of Indiana, sitting without a jury, and was found guilty *72 as charged on all three counts. The petitioner was sentenced to imprisonment for a period of 1 year on each of the three counts. Respondent in his notice of deficiency determined that petitioners realized taxable income in 1955 of $7,000 from Stone; in 1956, of $5,536 [5] from Dallas, Van Bibber, Maurer, Martin, and Stone; and in 1957, of $11,166 from Whitehead and Schaad. Respondent made an offsetting adjustment of $750 in 1957 to reflect the amounts refunded to Dallas, Van Bibber, and Maurer. Respondent also determined that petitioners are liable for additions to tax for fraud under section 6653(b) in all 3 years. Opinion Deficiencies The issue presented for decision is whether petitioner is chargeable with taxable income in the years 1955, 1956, and 1957 by virtue of his receipt in those years of substantial sums of money from various Evansville, Indiana, businessmen under the circumstances detailed in our findings of fact. It is our factual *73 determination that petitioner received the money in pursuance of a series of fraudulent schemes and that he neither intended to obtain the merchandise or perform the services he promised, nor return any of the money paid to him. [6] We will not restate here the specific facts that lead us to this conclusion as they are set out in detail in our findings herein. It is sufficient to note with regard to petitioner's dealings herein that he received not a single receipt while supposedly disposing of some $23,000 of other people's money; he kept not a single book or record; he produced not a single witness to testify to any of his supposed activities; and he appeared in not a single record or file of any of the business establishments he supposedly dealt with. The fantastic nature of petitioner's explanation of the disposition of over $17,000 in 1956 and 1957 is but another indication of the fraudulent nature of petitioner's activities. According to petitioner, in 1956, as part of the anti-freeze purchases, he gave one John Diorgino some $6,000, whereupon Diorgino promptly fled the country along with the money. However, in 1957, as part of the home appliance dealings, petitioner supposedly *74 gave the same Diorgino another $11,000, whereupon Diorgino refused to either return the money or supply the appliances. Subsequent investigation by the United States Department of Justice failed to disclose any record of John Diorgino and he has never been heard from again. From the evidence before us we find him to be a pure fabrication of petitioner's imagination. Petitioner's position is that the moneys received were nontaxable loans as evidenced by the promissory notes executed by him. [7] The question presented then is whether the amounts received herein by petitioner in the form of "loans" constitute taxable income. In United States v. Rochelle, 384 F. 2d 748 (C.A. 5, 1967), the Court stated: *75 A loan does not in itself constitute income to the borrower, because whatever temporary economic benefit he derives from the use of the funds is offset by the corresponding obligation to repay them. See James v. United States, supra * * * at 219 * * * Where the loans are obtained by fraud, and where it is apparent that the recipient recognizes no obligation to repay, the transaction becomes a "wrongful appropriation [and comes] within the broad sweep of 'gross income.'" Ibid. In Rozelle McSpadden, 50 T.C. 478 (1968), this Court accepted the above analysis in the Rochelle case, and it is our conclusion that it is determinative of 1300 the issue herein. Surely the fact that petitioner cast his transactions in the form of loans cannot render the money received therefrom any less taxable than sums obtained outright by fraudulent means, which clearly constitute taxable income. Rutkin v. United States, 343 U.S. 130 (1952). We therefore conclude that the $7,000 in 1955 and $11,166 in 1957 received by petitioner constituted taxable income to him in those years. *76 Petitioner argues in the alternative that as regards 1955, he incurred deductible ordinary and necessary business expenses during the promotion of the Bit O' Santa Claus venture. Petitioner has the burden of proof on this issue. According to his testimony, he expended certain amounts for such items as transportation, food, lodging, cabs, phone calls, etc., on his various trips to New York in pursuance of this business venture. However, aside from this selfserving testimony, petitioner has failed to produce any bills, receipts, canceled checks or anything else evidencing these alleged expenditures. In addition, petitioner has failed to introduce a single witness to corroborate the fact that he had ever gone to New York to promote the Bit O' Santa Claus deal. The failure of a party to call a witness where it would be natural under the circumstances to do so raises an inference adverse to that party, see Michael Pendola, 50 T.C. 509 (1968), and strengthens our conclusion that petitioner, in fact, never incurred the expenses claimed by him. Therefore, we hold that the petitioner *77 is not entitled to a deduction in 1955 in relation to the Bit O' Santa Claus promotion. Additions to Tax for Fraud Respondent contends that both petitioner and his wife are precluded from denying herein that the deficiencies in income tax for the years involved were due in whole or in part to fraud with intent on the part of petitioner to evade tax. It is now well settled that a person is collaterally estopped to deny the imposition of an addition to tax for fraud under section 6653(b) for a year upon which he has been criminally convicted of tax evasion pursuant to section 7201. John W. Amos, 43 T.C. 50 (1964), affd. 360 F. 2d 358 (C.A. 4, 1965); Arctic Ice Cream Co., 43 T.C. 68 (1964). Therefore as regards petitioner, his criminal conviction for the years 1955, 1956, and 1957 prevents him from contesting the imposition of additions to tax for fraud for those years. It is respondent's position that not only is petitioner precluded from denying the imposition of the additions to tax, but that his wife is similarly precluded. However, that *78 question need not be reached here because it is our conclusion that sufficient evidence of the fraud of petitioner was introduced in this case, to which petitioner's wife was a party, to establish her liability independent of petitioner's criminal conviction. Respondent has made a "clear and convincing" showing on the merits that at least part of the underpayment of tax for each of the years involved was due to fraud by the petitioner. And petitioner's wife is jointly and severally liable for the deficiencies and additions to tax, notwithstanding her innocence of any fraudulent conduct. Louise M. Scudder, 48 T.C. 36 (1967). Where large amounts of income are undoubtedly received and over several successive years omitted from taxpayer's returns, it is convincing evidence of fraud. United Dressed Beef Co., 23 T.C. 879 (1955); Arlette Coat Co., 14 T.C. 751 (1950). In the instant case, we have determined that petitioner omitted taxable income in 1955, 1956, and 1957 in the amounts of $7,000, $5,536, and $11,166, respectively. In addition, the following *79 indicia of fraud are also present herein: failure to keep adequate books and records, Bryan v. Commissioner, 209 F. 2d 822 (C.A. 5, 1954), affirming a Memorandum Opinion of this Court; Leon Papineau, 28 T.C. 54 (1957); and material misstatements to a revenue agent, Nathan Bilsky, 31 T.C. 35 (1958). Although direct evidence of a taxpayer's subjective intent to defraud is seldom available, this requisite intent may be ascertained from the surrounding circumstances, including the conduct of the taxpayer and the reasonable inferences therefrom. M. Rea Gano, 19 B.T.A. 518 (1930). In the present case, petitioner's fraudulent conduct in regard to the acquisition of the sums in question and his failure to disclose these sums to his wife who was the preparer of the tax returns, further support our determination that at least part of the underpayments of tax in the years in question were due to fraud by petitioner. Decision will be entered for the respondent. 1301 Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
2. At trial, petitioners submitted a number of written motions objecting to the admission of certain of the testimony and evidence offered by respondent. Since these motions contain some 64 separate objections, we will not endeavor in this opinion to address ourselves to each objection individually, but our disposition of them is contained in the facts we have found herein. However, we shall dispose immediately of petitioners' motion objecting generally to the admission in this case of any prior recorded testimony. We are of the opinion that petitioners' stipultaion that a true and correct copy of certain testimony and exhibits from a previous litigation was admissible, provided that "petitioners reserve the right to raise any objection to the testimony and evidence that could have been made if the witnesses were testifying in person," waives the general hearsay objection to that prior recorded testimony raised by petitioners' motion.↩
1. These four amounts were consolidated into a single $4,500 note upon the request of Stone. Also, in addition to the $7,000 in advances listed herein, in 1956 petitioner received a check for $210 from the printing company owned by Stone.↩
3. Petitioner challenges the admissibility in evidence of the testimony concerning these searches. The objections fall into two main categories: (1) Objections to testimony by the witness concerning the replies to his inquiries regarding petitioner. While it may have been possible to require each employee of whom inquiry was made to testify to his lack of knowledge of petitioner, it is our opinion that the ends of justice are more fully served by admitting the evidence of fruitles inquiries, and leaving petitioner the opportunity to present proof of his presence, which if his claims are true, he should easily be able to do. The testimony concerning fruitless inquiry does not violate the hearsay rule because it is admissible to show the thoroughness of the witnesses' search, not as direct evidence of nonexistence. McCormick, Handbook of the Law of Evidence, 469 (1954). See Note, 46 Harv. L. Rev. 715 (1933). (2) Objections to testimony by the witness regarding the results of searches of business records made by others. The Federal Business Records Act, 28 U.S.C., sec. 1732 (the applicable provision, see Rule 31, Tax Court Rules of Practice), does not require that the person testifying in respect of the records have personal knowledge of their contents. Wheeler v. United States, 211 F. 2d 19↩ (C.A. D.C., 1953). As for the question of whether the absence of any record of an event is receivable as evidence of its nonoccurrence, although the decisions are divided, we are of the opinion that it is so receivable. See 5 Wigmore, Evidence, sec. 1531.
4. Respondent explains on brief that because the evidence is unclear as to the nature of the amount received by petitioner from the Spaghetti Bowl, he has not included that amount in his asserted deficiency for 1955.↩
1. These amounts were paid by checks of Dallas and Van Bibber Shell Service, the service station operated by Dallas and Van Bibber.↩
1. These amounts were paid by checks of Ed Whitehead's, the appliance store operated by Whitehead.↩
1. These amounts were paid by checks of Bob Schaad Co., Incorporated, the appliance store operated by Schaad.↩
5. We note a slight discrepancy in this figure. Respondent, in arriving at the figure of $5,536, included taxable income from Stone in the amount of $236. However, the check from Stone introduced in evidence herein is for $210.↩
6. In our opinion, the infrequent instances when petitioner repaid small sums to certain of the businessmen involved in order to avoid greater difficulty with them does not negate our conclusion that petitioner never intended to repay the money he received.↩
7. At trial, petitioner presented testimony solely in regard to the Bit O' Santa Claus promotion. On brief, petitioner makes the nontaxable loan argument only in regard to the moneys received from Stone, Whitehead, and Schaad. We take this to mean that petitioner concedes the taxable nature of the sums received from Dallas, Van Bibber, Martin, and Maurer in 1956, and that only the transactions in 1955 and 1957 involving Stone, Whitehead, and Schaad remain for decision.↩