**UNITED STATES of America,**
**Appellant,**

v.

**William J. ROCHELLE, Jr., Trustee in**
**Bankruptcy for John Milton Ad-**
**dison, Bankrupt, Appellee.**

No. 23923.

United States Court of Appeals
Fifth Circuit.

Oct. 20, 1967.

Melvin M. Diggs, U. S. Atty., Dallas, Tex., Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Anthony Z. Roisman, Attys., Dept. of Justice, Washington, D. C., for appellant.

J. Harvey Lewis, Dallas, Tex., for appellee.

Before RIVES, WISDOM and GOLD-BERG, Circuit Judges.

WISDOM, Circuit Judge:

Is money obtained from a swindle taxable income to the swindler? We hold that it is. And it makes no difference if the swindle is in the form of a loan and the "lenders" so beguiled that they really believe that they made bona fide loans.

* * *

Once again the financial dealings of promoter John Milton Addison are before the federal courts.[1] The present case involves a claim for federal income taxes asserted in Addison's bankruptcy proceedings. The contest is between the taxing authorities and the trustee, representing creditors defrauded by Addison. These creditors "lent" money to Addison to finance non-existent enterprises. The basic facts are not in dispute.

Creditors filed an involuntary petition in bankruptcy against Addison on February 23, 1960, and on July 7, 1960, he was adjudicated a bankrupt. Before this adjudication, the Secretary of the Treasury, on July 2, 1959, had terminated Addison's tax year under Section 6851 of the Internal Revenue Code of 1954 (26 U.S.C. § 6851). Addison's tax liability for the period from January 1, 1959, through June 30, 1959, was assessed in the amount of $124,485.24.

On July 3, 1959, the District Director of Internal Revenue served a notice of levy with respect to this tax liability on Braniff Airways, Inc. At that time Braniff was holding Addison's brief case—left overlong in an airport locker—containing checks and money orders totaling $146,625, of which $20,925 was in personal checks payable to Addison, later found to be uncollectable, and $125,700 was in cashier's checks, bank money orders, and American Express money orders. These funds were transferred to the referee in bankruptcy under a court order providing that the transfer should be without prejudice to whatever rights the United States may have acquired by the levy.[2]

In due course of the bankruptcy proceeding, the United States filed its proof of claim for the amount of Addison's alleged tax liability. If the claim of the United States is allowed, it will take first priority and exhaust the assets of the bankrupt estate. The bankruptcy proceedings were held up to await the outcome of a criminal prosecution brought against Addison. Eventually,

---

1. Addison and a number of his associates were convicted of violations of the Securities and Exchange Act, using the mails to defraud, and conspiracy. The transactions involved in the criminal prosecutions were in part the same so-called "loans" as are before us in this case. See Addison v. United States, 5 Cir. 1963, 317 F.2d 808, cert. denied, 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d 605, reh. denied, 376 U.S. 966, 84 S.Ct. 1121, 11 L.Ed.2d 984. See also S.E.C. v. Addison, N.D. Tex.1961, 194 F.Supp. 709, in which Addison and his associates were enjoined from issuing "securities" to secure the "loans".

2. The trustee does not contest the validity of the lien. Even if we were to accept, arguendo, the contention that the funds held by Addison were "loans", it is clear that they were induced by a fraudulent scheme, and therefore Addison had sufficient legal interest in money for it to be properly subject to levy. See Akers v. Scofield, 5 Cir. 1948, 167 F.2d 718, cert. denied, 355 U.S. 823, 69 S.Ct. 47, 93 L.Ed. 378, 54 Tex.Jur.2d, Swindling and Cheating, §§ 2, 14.

after a hearing in 1965, the referee in bankruptcy entered an order disallowing the claim of the government.

The referee found: "There is no evidence that the Bankrupt in fact did in good faith intend to repay the money or interest thereon in accordance with his promises, and the inference which I draw from the evidence is that he had no such intention". Nevertheless the referee took the view that "a broad definition should be accorded the term 'loan' "; that the "subjective intent of the borrower, undisclosed to trusting lenders, not to repay the money" does not convert a loan into taxable income; that "if the issue arose between the taxing authorities and the fraudulent borrower, conceivably the answer might be different." The district judge, Judge T. Whitfield Davidson, agreed with the Referee: "The Court's position is that the Referee in his findings must be sustained. *That which a man borrows he does not earn.*" (Original emphasis.) We reverse.

## I.

John Milton Addison was no small-time confidence man. Nor did he appeal to persons satisfied with small profits. During the tax period in question (six months) he received $835,000 as "loans" to finance various non-existent ventures. The district judge commented: "The Bankrupt, John Milton Addison, was a promoter on a large scale with almost magnetic powers in presenting his promotion schemes and by which means he collected immense sums of money. An unusual feature of his schemes for him and his several associates was to so impress the lenders of money that there was a fortune of untold millions involved and that they would become with him joint owners by reason of the loan, *but they must tell no one of that promise which he was making them."* (Emphasis added.) Addison held out attractive lures. For example, he purported to own patent rights to a device, the Benson Upgrader, which at a total investment cost of $65,000 would produce profits of $86,000 a day and, by upgrading low-grade uranium, would replace a 13 million dollar uranium mill. He represented that he and his associates owned a uranium mine containing 2½ million dollars of uranium and that they controlled 20,000 acres in Colorado, rich in oil and gas, containing vast nickel deposits and timber reserves. He had plans under way to build a magnificent hotel in Colorado where the lenders could own their own luxury suites. According to Addison, the Clint Murchison family was backing him and Merrill, Lynch, Pierce, Fenner and Beane had offered to purchase 49 per cent of his interests for 18 million dollars.

Addison's activities were conducted in a carefully planned and well-organized manner, with the assistance of a large number of associates.[3] Addison or his associates would meet with prospective investors and represent to them that Addison was engaged in speculative but highly profitable businesses. They suggested that if these people were to "lend" money to Addison's enterprises, they would be assured of getting back the amount of the "loans" and moreover would acquire a part interest in the enterprises, from which they could expect to receive handsome profits. The court below found as a fact that all of the representations made by Addison and his associates to induce these loans were false. Additionally we note, as did the court below, that Addison was convicted by a jury of using the mails to defraud as part of this scheme. See Addison v. United States, 5 Cir. 1963, 317 F.2d 808, cert. denied, 376 U.S. 905, 84 S.Ct. 658, 11 L.Ed.2d 605, reh. denied, 376 U.S. 966, 84 S.Ct. 1121, 11 L.Ed.2d 984. Originally, these "loans" were "secured" by promissory notes, but on the complaint of the Securities and Exchange Commission, Addison was enjoined from issuing such notes in violation of the Securities and Exchange Act.

---

3. For a full discussion of Addison's operations, see Securities and Exchange Commission v. Addison, N.D.Tex.1961, 194 F. Supp. 709, 714–721.

S.E.C. v. Addison, N.D.Tex.1961, 194 F. Supp. 709. Thereafter the loans had behind them Addison's oral promises.

The record does not indicate exactly how many of these "loans" were made, or the total amount, but it is clear that the activity continued over many years and that the total sum was substantial. It is also clear from the record that Addison treated the funds provided by these loans as belonging to him and to his associates without any restriction. They constituted the sole source of income for Addison and his associates, and Addison lived lavishly on these funds. Most of the "lenders" are claimants in the bankruptcy proceeding.

The trial court held on this record that "the Bankrupt was a borrower of money which he promised to return". Accepting the findings of fact as supported by the record, we conclude that the Bankrupt was a *purported* borrower of money which he *falsely* promised to return. The transactions here were not loans at all, but a fraud to acquire money from innocent third parties.[4]

## II.

The issue before us in this case may be stated as follows: When an individual secures money from many third parties by false representations, and when such funds constitute his sole source of support for several years, do these sums constitute taxable income, under section 61 of the Internal Revenue Code, notwithstanding the fact that the transactions are in the form of loans?

The proper labeling for tax purposes of various kinds of ill-gotten gains has long been a vexing question for the federal courts. In dealing with it, we keep in mind the admonition that in enacting what is now section 61 of the tax code, Congress meant "to use the full measure of its taxing power" under the Sixteenth Amendment. Helvering v. Clifford, 309 U.S. 331, 334,

60 S.Ct. 554, 84 L.Ed. 788. The Supreme Court, after many years of hesitation, has now firmly concluded that the *economic benefit* accruing to the taxpayer is the controlling factor in determining whether a gain is "income". Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833; Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483; James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246. A loan does not in itself constitute income to the borrower, because whatever temporary economic benefit he derives from the use of the funds is offset by the corresponding obligation to repay them. See James v. United States, supra 266 U.S. at 219, 81 S.Ct. at 1055. Where the loans are obtained by fraud, and where it is apparent that the recipient recognizes no obligation to repay, the transaction becomes a "wrongful appropriation [and comes] within the broad sweep of 'gross income'". Ibid.

We perceive no qualitative difference with regard to taxability between the gains of an extortionist, held taxable in *Rutkin,* those of an embezzler, held taxable in *James,* and those derived by a confidence man like Addison. The extortionist uses coercion, the embezzler stealth, and the confidence man false promises. All are legally under an obligation to repay their ill-gotten gains. All are guilty of crimes under the laws of the various states. As the Court said in *Rutkin;*

An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. Burnet v. Wells, 289 U.S. 670, 678, 53 S.Ct. 761, 764, 77 L.Ed. 1439; Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 337, 74 L.Ed. 916. That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient free-

4. Compare Cohen v. United States, 9 Cir. 1961, 297 F.2d 760, in which transactions purported by the taxpayer to be loans were considered to be income by the court in a prosecution for tax evasion.

dom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it. 343 U.S. at 137, 72 S.Ct. at 575.

While it is true that the lenders in this case would appear to have a claim against Addison for repayment of their loan, this is not relevant to the question of their taxability to Addison.[5] Were we to hold otherwise, confidence men could avoid the tax consequences of their transactions by merely adding a false promise to repay to their other representations. Such a distinction between fraudulently obtained "loans" and fraudulently obtained outright grants is not tenable here.

The judgment below is reversed and the case remanded for further proceedings not inconsistent with this opinion.

---

5. The Referee in Bankruptcy and the district court below apparently considered it significant that the dispute here involves a contest between the United States and the defrauded lenders, who are the claimants in the Bankruptcy proceeding. While we are not without sympathy for these victims of Addison's schemes, we do not perceive the relevance of the procedural posture of the case in this respect. It is for Congress, and not the Courts, to determine priorities in both taxation and Bankruptcy. Since Congress has decided that income shall be taxable, and that a properly obtained lien for taxes shall have first priority in Bankruptcy, it is their decision and not ours that the United States shall take all and the other claimants nothing.