Harold Gradsky and Bertha Gradsky, et al. [1] v. Commissioner. Gradsky v. Commissioner
Docket Nos. 1128-63, 4373-67, 4374-67.
United States Tax Court
T.C. Memo 1970-145; 1970 Tax Ct. Memo LEXIS 219; 29 T.C.M. (CCH) 625; T.C.M. (RIA) 70145; June 8, 1970, Filed Sidney A. Soltz, Biscayne Bldg., Miami, Fla., for the petitioners.Meno W. Piliaris, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax for the taxable years 1958 through 1962, inclusive, as follows: Docket
Addition to tax
number
Year
Deficiency
Sec. 6653(a) [2]
Sec. 6653(b)
1128-63
1958
$ 3,817.81
$ 190.89
4374-67
1959
54,615.11
$ 27,307.56
1960
48,827.36
2,441.37
1961
1,013.77
50.69
4373-67
1962
205,252.41
102,626.21
*220 The cases were consolidated for purposes of trial. At the trial, respondent conceded that the issue relating to additions to tax for fraud for the taxable years 1959 and 1962 was eliminated. Due to certain other concessions made by the parties, the issues remaining for our decision are: (1) whether 626 petitioners have proven the basis of $1,031.25 claimed on their 1958 income tax return for a frame building located in Dayton, Ohio, which was condemned in that year; (2) whether petitioners received unreported income from Inter-City Finance Corporation in the taxable year 1958 in the amount of $5,000; (3) whether petitioners realized taxable income for the years 1960 and 1961, and Harold Gradsky, individually, for the year 1962, in the amounts of $93,595.04, $13,796.10, and $247,000, respectively, by reason of alleged loans and transfers of funds to petitioners and to corporations owned or controlled by the petitioners or their immediate family; (4) whether petitioner is entitled to a casualty loss deduction in the year 1962 of $900; and (5) whether petitioners are *221 liable for the addition to tax under section 6653(a) of the Code of 1954 for the years 1958, 1960, and 1961. Findings of Fact Some of the facts have been stipulated and are found accordingly. The facts reflected in the exhibits received in evidence are incorporated herein by reference. Petitioners Harold and Bertha Gradsky are husband and wife who, at the time they filed the petitions in docket numbers 1128-63 and 4374-67, resided at Miami Beach, Florida. They filed their joint Federal income tax returns for the calendar years 1958 through 1961 with the district director of internal revenue at Jacksonville, Florida. Petitioner Harold Gradsky, hereinafter sometimes called petitioner or Gradsky, resided at Miami Beach, Florida, at the time he filed his petition in docket number 4373-67. He filed his individual income tax return for the calendar year 1962 with the district director of internal revenue, Jacksonville, Florida. Issue 1. Basis - Frame Building On their 1958 Federal income tax return, the petitioners reported a long-term capital loss from the involuntary conversion by condemnation of a frame building located in Dayton, Ohio. Petitioners claimed a loss of $1,031.25 *222 predicated on their purported cost of the building in 1950. The respondent disallowed the claimed cost for lack of substantiating evidence. Issue 2. Other Income ($5,000) For the taxable year 1958, the respondent determined that petitioners received unreported income from Inter-City Finance Corporation in the total amount of $7,539. Petitioners conceded having received $2,539 of this amount as income in that year. Issue 3. Other Income - Fidelity Investment and Loan Associates, Inc., and Gulf Intercontinental Finance Corporation In June 1960, petitioner and others caused the incorporation of a business known as Federal Investment and Loan Associates, Inc. The name of his business was changed shortly thereafter to Fidelity Investment and Loan Associates, Inc., hereinafter sometimes referred to as Fidelity. Fidelity was in business for a little over a year. For a few months, its home office was in Miami Beach, Florida, with branch sales offices at Fort Lauderdale, Florida, and Orlando, Florida. Then its headquarters was moved to the Fort Lauderdale office. Fidelity offered its notes to the public by representing, inter alia, a high yield of interest; safety of investment; *223 a bona fide legitimate commercial lending operation with highly profitable net earnings; much more interest than that paid by banks, savings and loan associations, Government bonds, municipal bonds, corporate bonds, and common stocks; experienced management; sound, conservative management policies; and assets consisting of cash reserves, Government bonds, real estate, first mortgages, and other secured investments. During the period from June 4, 1960, to August 11, 1961, when Fidelity was in operation, it sold to investors its 8 percent promissory notes, totaling in excess of $287,000. During this same period, conventional banking and savings and loan institutions in the Dade County, Florida, area were paying a maximum of 3 percent to 4 percent on savings passbook accounts. Fidelity solicited investors' funds under a promise to pay interest monthly and to repay the principal on the 360th day. The investors' capital investment was for a 1-year period. Fidelity made purported interest payments out of principal and not out of earnings. At the time Fidelity began soliciting investors' funds, it did not have any operating business ventures which were earning income for it. When *224 Fidelity began its business, it had no invested capital. It started its operation 627 on a $15,000 advance from petitioner. The only capital committed to the risk of the proposed business of Fidelity by a stockholder was $500 which was credited to the capital account of Fidelity on July 31, 1961. This was done by a journal entry charging the loan account of petitioner and crediting the corporation's capital account. Petitioner was the chairman of Fidelity's board of directors. He hired and fired its officers and employees as he pleased. He hired Charlotte Steinberg Singer as a bookkeeper and later made her an officer. Also, he fired the president, Leonard Press. During the period that Fidelity was in operation, a portion of the funds obtained from its investors was disbursed to various business entities. Petitioner directed Singer to advance funds to these corporations, including among others, L.G. Enterprises, Inc., Fort Myers Properties, Inc., and Gale Associates, Inc. As of December 31, 1960, and 1961, Bertha Gradsky owned 100 percent of the stock of Gale Associates, Inc., and petitioner was vice president of this corporation. For the year 1960, Gale Associates, Inc. *225 , had a loss from operations in the amount of $8,524.30 and for the year 1961 it had a loss from operations in the amount of $21,323.67. As of December 31, 1960, Gale Associates had an operating deficit of $16,586.37 and as of December 31, 1961, it had an operating deficit of $38,367.99. Petitioner was the principal stockholder in Coastal Mortgage and Investment Corporation. Fort Myers Properties, Incorporated, was organized under the laws of the State of Florida on February 24, 1960. The certificate of incorporation discloses the following: Name
Office
Shares of stocksubscribed
Leon Gradsky
President
250
Harold Gradsky
Secretary-treasurer
249
Jonathan Jones
Vice president
1
L.G. Enterprises, Inc., was organized under the laws of the State of Florida on January 9, 1959. The certificate of incorporation discloses the following: Name
Office
Shares of stocksubscribed
Leon Gradsky
President
20
Nelda Chiboucas
Secretary-treasurer
1
Joseph Zahare
Secretary-treasurer
1
Harmony Homes, Inc., was organized under the laws of the State of Florida on August 26, 1960. The certificate of incorporation discloses the following: *226 Name
Office
Shares of Stocksubscribed
Leon Gradsky
President
40
Eleanor Moss
Vice president
5
Charlotte Steinberg
Secretary
5
On November 28, 1960, Harmony Homes, Inc., filed a resident agent certificate with the State of Florida containing the following: Officer
Title
Harold Gradsky
President
William G. Poulos
Vice president
Myron W. Collins
Vice president
Charlotte Steinberg
Secretary-treasurer
Corporate income tax returns were not filed for the years 1960 and 1961 by Harmony Homes, Inc., Coastal Mortgage and Investment Corporation, Fort Myers Properties, Inc., and L.G. Enterprises, Inc. The summary with regard to disbursements out of Fidelity and of receipts into Fidelity during the period of its operation is set forth below: 628 Calendar year 1960
Disbursements out
Recipts into
Net amount pay-
of Fidelity
Fidelity
able to Fidelity
Harold Gradsky
$ 8,258.98
$ 21,750.00
[13,491.02)
Coastal Mortgage Company
25,879.00
21,821.83
4,057.17
Fort Myers Properties, Inc.
31,200.00
31,200.00
L.G. Enterprises, Inc.
72,900.00
1,188.70
71,711.30
Gale Associates
29,000.00
7,612.50
21,387.50
Harmony Homes, Inc.
11,955.09
3,100.00
8,855.09
Dayton View 1,075.00
1,075.00
Total $180,268.07
$ 86,673.03
$ 93,595.04
*227 Calendar year 1961
Disbursements out
Recipts into
Net amount pay-
of Fidelity
Fidelity
able to Fidelity
Harold Gradsky
$ 6,872.64
$ 3,950.00
$ 2,922.64
Fort Myers Properties, Inc.
8,300.00
3,526.71
4,773.29
L.G. Enterprises, Inc.
2,000.00
2,000.00
Gale Associates
7,501.25
2,407.92
5,093.33
Harmony Homes, Inc.
4,280.70
4,087.30
193.40
Dayton View
700.00
1,886.56
(1,186.56)
Total $ 29,654.59
$ 15,858.49
$ 13,796.10 In addition to the "advances" to the various business entities mentioned hereinabove, the business activities of Fidelity consisted of the purchase of a number of mortgages from L.G. Enterprises, Inc., and Fort Myers Properties, Inc., the purchase of the Carnival Motel in Miami Beach, and the purchase and sale of automobiles. Fidelity and several of the corporations mentioned herein maintained bank accounts at the Bank of Miami Beach, Florida, as follows: Fidelity Investment & Loan Associates, Inc.
Opened 6/7/60 Authorized signature: Harold Gradsky only. Harmony Homes, Inc. Opened 9/8/60 Authorized signatures: Harold Gradsky or Myron W. Collins. Coastal Mortgage and Investment Corporation *228 Opened 4/13/59 Authorized signatures: Harold Gradsky - President or L.H. Gradsky - Manager. Gale Associates, Inc. Opened 8/31/60 Authorized signatures: L. H. Gradsky and Harold Gradsky. The main banking of Fidelity was done at the Bank of Miami Beach. The branch offices of Fidelity had their own bank accounts but the funds were transferred from these accounts and placed in the Bank of Miami Beach. Fidelity also maintained a bank account at the Fort Lauderdale National Bank. The authorized signatures on this account were: Harold Gradsky, Charlotte Steinberg, Arthur Freeman, and Leonard Press. All checks on this account required two signatures. Late in 1961, Fidelity went into a bankruptcy reorganization and in five or six months was declared bankrupt. The respondent determined that in the taxable years 1960 and 1961, the petitioners received taxable income from Fidelity in the respective amounts of $93,595.04 and $13,796.10. About September 1962, petitioner, Leon Herman Gradsky, Saul M. Liberman, Chester Maier, and Milton Holtzman Spell were instrumental in the forming, operating, managing or advising of Gulf Intercontinental Finance Corporation, Ltd., a Canadian *229 corporation and its wholly-owned Florida corporate subsidiary, Auto Factors of America, Inc. Petitioner personally advised the attorney for Gulf as to how to organize the new Canadian corporation. The business of Gulf included the public offer and sale of securities, namely, 8 percent and 8 i/2 percent notes of Gulf to 629 Canadians by means of an extensive advertising campaign in newspapers published in principal Canadian cities. Approximately 450 Canadians purchased $800,000 of these securities. Great Western Land Corporation and Kane Leasing Corporation were incorporated under the laws of the State of Florida by an attorney at the request of petitioner. Great Western Land Corporation was incorporated on October 23, 1962, and Kane Leasing Corporation was incorporated on December 18, 1962. The individuals whose names appear on the articles of incorporation signed these documents to facilitate incorporation. They had no interest in the corporation other than this formality. Likewise, Auto Factors of America, Inc., and New Car Discount Center, Inc., were incorporated on November 28, 1962, under the laws of the State of Florida by an attorney at the request of petitioner. *230 The individuals whose names appear on the articles of incorporation signed these documents to facilitate incorporation. They had no interest in the corporation other than this formality. At the time of the instant proceeding, neither the attorney who represented petitioner nor any of the other individuals who signed the articles of incorporation of Auto Factors of America, Inc., and New Car Discount Center, Inc., had in their possession any of the corporate books or records. Petitioner was president and sole stockholder of New Car Discount Center, Inc., Kane Leasing Corporation, and Great Western Land Corporation and his was the only authorized signature on the bank accounts of these companies. Petitioner made all decisions with regard to these three companies. Saul M. Liberman was president of Auto Factors of America, Inc., and his was the only authorized signature on its checking account. Leon H. Gradsky was president of Southern Motor Sales and his was the only authorized signature on its bank account. During the taxable year 1962, Auto Factors of America, Inc., deposited $250,500 received from Gulf, of which $250,000 was purportedly a loan, and $500 was Auto Factors' *231 paid-in capital. During the taxable year 1962, Auto Factors issued checks, purportedly as loans, to New Car Discount, Southern Motors Sales, and Kane Leasing in the amounts of $150,000, $70,000 and $25,000, respectively. During the period November 1, 1962, to December 28, 1962, petitioner deposited to his personal checking account in the Grace National Bank of New York, $85,000 received from Gulf. Of this amount, $75,000 was purported to be a personal loan and $10,000 was a consulting fee for work done on behalf of Gulf. The $10,000 consulting fee was reported by petitioner on his income tax return for the year 1962. During the taxable year 1962, New Car Discount issued a check to Kane Leasing, purportedly as a loan, for the amount of $39,600 and a check, purportedly as a partial repayment of a loan in the amount of $3,000 to Auto Factors. During this same period, petitioner issued checks on his checking account at the Grace National Bank of New York, purportedly as loans, for $50,500 and $6,000 to Great Western and New Car Discount, respectively. No books and records were maintained by New Car Discount Center, Inc., Great Western Land Corporation, and Kane Leasing Corporation. *232 These corporations were in business for less than a month when a receiver appointed by the United States District Court for the Southern District of Florida took possession of their bank statements and canceled checks. On January 25, 1963, a civil complaint was filed in the United States District Court for the Southern District of Florida. The Securities and Exchange Commission was the plaintiff and the following were defendants: Gulf Intercontinental Finance Corporation, Limited (a Dominion of Canada Corporation) Harold Gradsky Leon Herman Gradsky Saul M. Liberman Milton Holtzman Spell Chester Maier (residents of and transacting business or found in the Southern District of Florida) Auto Factors of America, Inc. Southern Motor Sales Corporation New Car Discount Center, Inc. Kane Leasing Corporation Great Western Land Corporation (all Florida corporations) The complaint, filed as case No. 63-40 Civ., charged fraudulent interstate securities 630 transactions under section 17(a) of the Securities Act of 1933 [3] (48 Stat. 74) and asked for (1) a temporary restraining order; (2) a preliminary injunction and a final judgment; and (3) the appointment of a receiver *233 to take over the assets stemming from the sale of securities. As the result of a hearing in the open court, at which petitioner was represented by counsel, the defendants by their counsel unconditionally agreed that the facts contained in a stipulation were true. The stipulation of facts, unsigned, was ordered filed in the official record of the District Court by Judge Emmett W. Choate on February 15, 1962. On March 12, 1963, the Court entered its Findings *234 of Fact and Conclusions of Law and incorporated therein the stipulation of facts, stating that the stipulation of facts had been agreed to by the defendants. The Court decided that a receiver should be appointed. The receiver took possession of the assets listed in his report which is dated July 18, 1962. The Court entered its final judgment on February 26, 1965, permanently enjoining the defendants from engaging in acts and practices which constitute violations of section 17(a) of the Securities Act of 1933. Gulf was unable to earn the monthly interest requirements on the 8 percent and 8 i/2 percent notes and the interest paid was paid out of the principal. Gulf impaired its principal by about $200,000 or about 25 percent of its outstanding note obligations. A petition for a receiving order in bankruptcy against Gulf was filed in Montreal, Canada, on February 4, 1963, in the Superior Court for the Province of Quebec, District of Montreal. A petition of intervention in the above bankruptcy proceeding against Gulf was filed on February 6, 1963, in the Superior Court for the Province of Quebec, District of Montreal. The District Court for the Southern District of Florida refused *235 to permit petitioner and his associates to wind up the affairs of the Gradsky corporations, holding that the present management lacked competency and integrity. Petitioner was convicted of an SEC violation and paid a fine. The conviction was based on the violation of Rule 240.10b-5 ( 17 CFR 240.10b-5). The respondent determined that in the taxable year 1962 (docket No. 4373-67) petitioner realized taxable income from Gulf, Kane Leasing Corporation, and New Car Discount Center, Inc., in the amount of $247,000. Issue 4. Casualty Loss ($900) During 1962, there was a robbery at petitioner's home and a mink stole and watch were stolen and the theft of these items was reported to the police. On his income tax return for the year 1962, petitioner claimed a deduction of $900 as a casualty loss as follows: Casualty loss:
Robbery December 27, 1962
1 Mink stole (depreciated)
$1,000
1 Watch 150
$1,150
Recovered from insurance Security Insurance Co., Atlanta, Ga 250
Loss claimed
$ 900
The respondent disallowed the claimed loss for lack of substantiating evidence. Issue 5. Addition to Tax (Sec. 6653(a)) The respondent determined *236 that part of the underpayment of tax for the years 1958, 1960, and 1961 was due to negligence or intentional disregard of rules and regulations and therefore asserted the addition to tax provided by section 6653(a) of the 1954 Code. Ultimate Findings of Fact The petitioners are not entitled to deduct the basis claimed in 1958 for a frame building located in Dayton, Ohio. The petitioners in 1958 failed to report taxable income from Inter-City Finance Corporation in the total amount of $5,000. Harold and Bertha Gradsky realized taxable income for the years 1960 and 1961, 631 and Harold Gradsky, individually for the year 1962, in the amounts of $93,595.04, $13,796.10, and $247,000, respectively, by reason of alleged loans and transfer of funds to petitioners and to corporations owned or controlled by the petitioners or their immediate family. Petitioner is not entitled to a casualty loss deduction in the year 1962 in the amount of $900 or in any other amount. Petitioners are liable for the addition to the tax provided by section 6653(a), supra, for each of the taxable years 1958, 1960, and 1961. Opinion Issue 1. Basis - Frame Building The petitioners claimed a *237 loss from condemnation on their 1958 income tax return in the amount of $1,031.25 due to the involuntary conversion in that year of a frame building in Dayton, Ohio. Petitioners, on brief, allege by way of concession, that the correct basis was only $956.25 rather than $1,031.25 because an error of $75 was made in computing the depreciation allowed or allowable from the time of acquisition in 1950. Petitioners contend that this frame building was acquired by them in 1950 for $1,500 and was used as rental property. They argue that depreciation allowed or allowable prior to 1952 was $93.75 and that depreciation of $75 was taken in 1952, and therefore, the additional depreciation between 1953 and 1958, when the property was condemned, was $375 for a total depreciation of $543.75 and an adjusted basis of $956.25. Petitioner attempted to prove the claimed basis of $956.25 solely by his testimony which we do not find to be convincing. Gradsky's testimony in this regard was of little or no probative value since he could not remember the total consideration he paid for the property involved. His testimony, which consisted of a refreshed recollection based on the cost basis claimed by him *238 on his 1952 return, presupposes that he properly reported the basis on his 1952 return and further presupposes that the basis was not returned by the involuntary conversion. It is noteworthy that petitioners indicated on the schedule attached to their 1958 return that the building in question had no sales price at the time of condemnation. We are not aware of any circumstances which would permit any governmental authority to condemn private property without compensation unless the building was in a total state of disrepair. In the absence of any convincing evidence, we hold that petitioners, who have the burden of proof, have failed to establish any basis in the property at the time of its disposition. Accordingly, respondent's determination is sustained. Issue 2. Other Income - $5,000 Respondent determined that the petitioners received $7,539 from Inter-City Finance Company as other income during the taxable year 1958. Petitioners conceded having received $2,539 of this amount, leaving in issue $5,000. Petitioner testified only that he had no recollection as to the $5,000 in dispute; and on brief, he avers that he had no interest and was not connected with this company other *239 than the fact that one of his corporations, Insured Rentals, leased automobiles to Inter-City Finance Company. Under the circumstances, we conclude that petitioners have failed to prove error in respondent's determination. Issue 3. Other Income - Fidelity Investment and Loan Associates, Inc., and Gulf Intercontinental Finance Corporation Respondent determined that Harold and Bertha Gradsky realized "other income" for the years 1960 and 1961 and Harold Gradsky, individually for the year 1962, in the amounts of $93,595.04, $13,796.10, and $247,000, respectively, by reason of alleged loans and transfer of funds to petitioners and to corporations owned or controlled by the petitioners or their immediate family. Petitioners, in opposition, contend that the proceeds in controversy were received by these taxable entities as bona fide loans and that they did not personally receive such amounts during the period involved. In essence, it is petitioners' position that the transactions between Fidelity Investment and Loan Associates, Inc., and the various entities involved during 1960 and 1961 had a legitimate business purpose and that the only other income Harold Gradsky received from Gulf *240 Intercontinental Finance Corporation in 1962 was the $10,000 consultation fee, which he reported on his income tax return for that year. Respondent's determination is, of course, presumptively correct and the burden is upon petitioners to demonstrate error therein. After careful consideration of the entire record, we do not believe that petitioners have overcome respondent's determination that they and their controlled business entities received the amounts in question pursuant to a fraudulent scheme, and hence 632 that such funds are taxable to petitioners during the period involved. Succinctly, the evidence shows that Fidelity was incorporated in June of 1960, and during its existence of a little over a year, it sold 8 percent 1-year promissory notes totaling in excess of $287,000 to the public, and under the circumstances set forth in our findings, it was quite improbable that a substantial amount thereof would ever be repaid. Gradsky, as chairman of Fidelity's board of directors, was the dominant and controlling force of its activities and made all decisions as to the disposition of its funds. Of the $287,000 obtained from investors, respondent determined that $93,595.04 *241 was diverted to petitioner's owned or controlled businesses in 1960, and that $13,796.10 was likewise diverted in 1961. These amounts, $93,595.04 and $13,796.10, represent the net amounts of disbursements of funds out of Fidelity and receipts received by Fidelity from Gradsky and his related business entities during 1960 and 1961, respectively. In form it appears that Fidelity and Gulf obtained the funds in controversy as loans and only because of their mismanagement or bad judgment these funds could not be paid to the lenders on maturity; but viewing their overall operations realistically, and particularly the role of petitioner, we are convinced that petitioner and his controlled entities were conspirators and the investors were innocent victims of their intentional misrepresentations and artifice. As part of the scheme to dupe investors into parting with their funds, petitioner and his cohorts offered them much higher interest rates than was currently being paid by lending institutions in the Miami area, and gave the controlled business entities, who in turn borrowed these funds, an aura of propriety. [4] The money obtained from the investing public was advanced to business entities *242 which were controlled by Gradsky or immediate members of his family, and in some instances, part of such funds was repaid to Fidelity which created the appearance of bona fide transactions. Also, a portion of the funds involved was shifted back and forth through the accounts of the controlled corporations; but eventually a substantial part of the funds involved was dissipated. While Gradsky was in complete control of Fidelity and made all of the decisions as to which related business enterprises received so-called loans from Fidelity, we find that he had the funds taken in by Fidelity funneled to him indirectly through these related business entities. Significantly, Gradsky could not recall any specific transactions with Fidelity, although a summary of its financial operations during 1960 and 1961 shows that in his personal capacity he purportedly received $8,258.98 and *243 $6,872.64 from Fidelity and paid $21,750 and $3,950, respectively, into the corporation. More important, the record fails to disclose whether Fidelity or any of the corporate entities to whom it made advances ever made a profit or was ever solvent. At the time Fidelity began soliciting funds from the public, it had no invested capital and no operating business ventures which were earning income and which could provide the funds to pay the promised interest. The only capital invested in Fidelity was $500 invested by Gradsky in July 1961, shortly before the corporation became bankrupt. In view of the questionable financial status of the business entities involved and Gradsky's modus operandi, we find that the transactions between the investors and Fidelity, and in turn the business entities involved, were not in reality loans since there was no intent or means to repay the money disclosed by the evidence. If any business was conducted by the corporate entities involved herein, it was solely for the purpose of obscuring Gradsky's scheme to obtain funds for his personal use and benefit. Looking to the substance of the various transactions involved, we find that the principal purpose *244 for the existence of Fidelity and Gulf with their related business enterprises was to serve as conduits through which the money of the investors could be channeled to petitioners. We will not restate here the specific facts that lead us to this conclusion as they are set out in our findings herein. It is sufficient to note that during the taxable period before us, petitioner was involved in a scheme in which all of the funds in controversy were diverted to his controlled business entities and that he therefore exercised complete dominion and control over these funds. The record shows that during 1960 and 1961, petitioner and his associates diverted 633 over $106,000 of the investors' funds from Fidelity into questionable Gradsky-owned or controlled enterprises. Ostensibly, these corporate entities had no means or intention to repay this money. In this connection, it is noteworthy that L.G. Enterprises, Inc., received from Fidelity a net of $71,711.30 in 1960 and $2,000 in 1961. This corporation was incorporated in 1959 and Leon Gradsky, petitioner's brother, owned virtually all of the outstanding stock. There is no evidence that this business ever operated profitably or that *245 it was in a position to borrow such amounts of money from conventional lending institutions. Likewise, Gale Associates, Inc., offers further indicia of the indiscriminate use of so-called borrowed funds by petitioner's controlled entities. This corporation was acquired by the petitioners about August 1960. The stock of Gale Associates was held 100 percent by Bertha Gradsky, and Harold Gradsky appears as the vice president of this corporation. Gale Associates, Inc., received from Fidelity through petitioner, a net of $21,387.50 in 1960 and a net of $5,093.33 in 1961. Similarly, other corporations, including Harmony Homes, Inc., Coastal Mortgage and Investment Corporation, and Fort Myers Properties, Inc., which were owned or controlled by petitioner or members of his immediate family, received from Fidelity substantial amounts of so-called loans in 1960 and 1961; and as set forth in detail in our findings, petitioner and these controlled and related corporations received net disbursements from Fidelity during 1960 and 1961 in the respective amounts of $93,595.04 and $13,796.10 which were never repaid. Petitioner has not explained to our satisfaction why these amounts were not returned *246 to Fidelity, nor has he explained how the funds were dissipated. We find no merit in his argument that in 1960 and 1961 he paid in $10,568.38 more than he received from Fidelity, and hence that he is entitled to a loss as a result of these transactions. Petitioner's self-serving declarations that all of the transactions entered into by Fidelity were legitimate business transactions were unconvincing and inconsistent with the facts. Manifestly, his testimony must be considered in the light of the other evidence of record and particularly the fact that he admitted that he was criminally convicted of a violation of the Securities and Exchange Commission rules involving the activities of Fidelity. Moreover, it is significant that petitioner, who had the burden of proof, has not presented a single witness to testify to any of the transactions relating to Fidelity and his owned or controlled business entities; or to corroborate his testimony as to the purported efforts of these corporations to manage and reinvest the capital of the investors. Under the circumstances, we think that his failure to do so warrants the conclusion that such testimony, if produced, would have been adverse to him. *247 Michael Pendola 50 T.C. 509, 519 (1968). With respect to the taxable year 1962, the record shows that after Fidelity was declared bankrupt in about September 1962, petitioner, his brother, and other individuals were instrumental in the organization of Gulf in Canada and its wholly-owned Florida corporate subsidiary, Auto Factors of America, Inc., to engage in similar activities as had Fidelity. Although Gradsky testified that his only relation with this enterprise was as a hired consultant, we note that he personally advised the attorney for Gulf as to how to set up the new corporation. Also, between October and the end of December 1962, Gradsky employed two attorneys to incorporate the four Florida corporations, Great Western Land Corporation, Kane Leasing Corporation, New Car Discount Center, Inc., and Southern Motor Sales. Gradsky was sole stockholder and president of three of these corporations and his brother, Leon, was president of the fourth, Southern Motor Sales. After this corporate structure was established, the aggregate amount of $250,500 was channeled from Gulf to Auto Factors of America, Inc., purportedly as a loan. Auto Factors of America, Inc., in *248 turn, disbursed $150,000 to New Car Discount Center, Inc., $70,000 to Southern Motor Sales, and $25,000 to Kane Leasing Corporation, all allegedly as loans. Petitioner made all decisions as to New Car Discount Center, Inc., and Kane Leasing Corporation, and his was the only authorized signature on the bank accounts of these companies. Respondent contends that Gradsky received $247,000 of other income during 1962 as a result of a deposit of $75,000 to his account by Gulf in the Grace National Bank of New York; net deposits in the Miami National Bank to New Car Discount Centers, Inc., from Gulf of $107,400; and net deposits in County National Bank to Kane Leasing Corporation from Gulf in the amount of $64,600. Petitioner urges that the only amounts he received from Gulf were a $10,000 consulting fee which was reported on his income tax return and a $75,000 loan, and that he issued checks in excess of $56,000 634 to the corporations involved herein; and further, that none of the intercompany transactions were for his benefit, directly or indirectly. We find no corroborative evidence in the record for petitioner's position. At the time Gulf transferred the funds in question to the *249 Florida corporations involved, there is no evidence that any of them had any assets or business activities which would justify loans in the amounts transferred to them. No affirmative evidence was adduced by petitioner relating to the nature and extent of their business operations, if any, and no books and records were maintained by these corporations. Apparently, these Florida corporations had not been in operation a month when a courtappointed receiver seized all of their property, including canceled checks. Petitioner has not explained or substantiated the underlying facts claimed by him to be true on brief pertaining to the advances made by Gulf to the Florida corporations. The record shows that in addition to the money which was channeled through the Florida corporations involved herein, $85,000 was sent to petitioner which he deposited in his personal checking account. Of this amount, $75,000 was purportedly an unsecured personal loan and $10,000 a consulting fee. Petitioner did not introduce any evidence with regard to the circumstances underlying the claimed $75,000 personal loan; and we do not believe that this money was intended to be a loan to him. In this connection, *250 it is noteworthy that the first and only interest payment made by petitioner on this so-called loan, a check in the amount of $750, was never deposited by Gulf. We recognize that the overall scheme is somewhat beclouded by the interchange of funds between the Florida corporations and the fact that Gradsky transferred $50,500 from his checking account at the Grace National Bank to Great Western Land Corporation and also transferred $6,000 to New Car Discount Center, Inc., both of which he was sole stockholder and president. Although he testified that he could not recall whether he was reimbursed in any amount by these corporations, he argues on brief that $10,000 was repaid by Great Western Land Corporation and that New Car Discount Center, Inc., repaid the $6,000 to him. Except for the funds received from Auto Factors of America, Inc., there is no evidence in the record that these Florida corporations had any assets at the time or means to repay the principal or interest on their purported loans from Gulf or from petitioner. Considering their fiscal status, we do not believe that these Florida corporations could have qualified for conventional loans of any substance from a bona fide *251 lending institution. We find that these corporations were nothing more than a facade for siphoning the funds out of Gulf and into the hands of Gradsky. While we do not base our conclusion upon the following fact, it is noteworthy that in 1963, the Securities and Exchange Commission instituted a civil action in the Southern District of Florida naming petitioner, Gulf, five Florida corporations, and other individuals as defendants. This suit was predicated on their fraudulent interstate securities transactions and sought the appointment of a receiver to take over the assets stemming from funds solicited from Canadian investors through Gulf. On February 26, 1965, the District Court for the Southern District of Florida enjoined petitioner and the other defendants from engaging in acts and practices which constitute violations of section 17(a) of the Securities Act of 1933, supra. We are mindful that the final report of the receiver (who took possession of all of Gulf's assets in the United States, as well as all assets belonging to other corporations in the United States which did business with Gulf) filed in July 1963, disclosed that he had seized in excess of $186,000 from the various *252 corporations involved, of which $59,376.28 was from the bank account of Kane Leasing Corporation, $40,308.27 from Great Western Land Corporation, $10,338 from Southern Motor Sales Corporation, and, also received about $66,000 from the sale of automobiles belonging to New Car Discount Center, Inc. Petitioners, who have the burden of proof, did not introduce any books and records of these corporations to show whether the funds seized by the receiver represented the money allegedly borrowed from Gulf, or were part of the purported advances by Gradsky to Great Western Land Corporation, and New Car Discount Center, Inc., or were regular proceeds from legitimate business activities, if any. Viewing the record in its entirety, we are convinced that petitioner's control over the funds in dispute, including the diversion of the Fidelity funds to his or his familycontrolled corporations, and the control exercised over the money diverted from Gulf to his Florida corporation, was 635 complete. In our judgment, petitioner had such command, control, and dominion over these funds during 1960 through 1962, inclusive, that as a practical matter, he realized economic gain and benefit and they *253 represent taxable income to him under section 61 of the 1954 Code for those years. Davis v. United States, 226 F. 2d 331, 334 (C.A. 6, 1955), certiorari denied 350 U.S. 965(1956); Hartman v. United States, 245 F. 2d 349, 352-353 (C.A. 8, 1957). See Charles R. Leaf, 33 T.C. 1093 (1960), affd. per curiam 295 F. 2d 503 (C.A. 6, 1961), in which "loans" were treated as income for tax purposes.
In United States v. Rochelle, 384 F. 2d 748 (C.A. 5, 1967), the Court stated: A loan does not in itself constitute income to the borrower, because whatever temporary economic benefit he derives from the use of the funds is offset by the corresponding obligation to repay them. See James v. United States, supra, 266 U.S. at 219 * * * Where the loans are obtained by fraud, and where it is apparent that the recipient recognizes no obligation to repay, the transaction becomes a "wrongful appropriation [and comes] within the broad sweep of 'gross income'". Ibid. In Rozelle McSpadden, 50 T.C. 478 (1968) *254 this Court accepted the above rationale in the Rochelle case and in our view, it is determinative of the issue herein. Ostensibly, the fact that the taxpayer cast his transactions in the form of loans cannot render the money received therefrom any less taxable than amounts obtained outright by fraudulent means which clearly constituted taxable income. Rutkin v. United States, 343 U.S. 130 (1952). To the same effect, see Moore v. United States, 412 F. 2d 974 (C.A. 5, 1969), and Cohen v. United States, 297 F. 2d 760, 762, 764, 769 (C.A. 9, 1962). The fact that the diversions in controversy were referred to as "loans" by petitioner and the corporations involved and that they may have treated them as such on their books and records is not conclusive of their true character in the absence of any cogent evidence of an intention to make repayment at the time of the taking. Respondent is not required to label the funds petitioners took from the corporations involved herein. It is not necessary to describe these funds as anything more than wrongful diversions since substance controls over form and taxation is concerned with actual command over the *255 property taxed. Davis v. United States, supra, 335. Admittedly, except for the purported loan of $75,000 received by Gradsky in 1962, there is no evidence before us as to how the remainder of the funds in question were used or dissipated by petitioners. Howbeit, the fact that these funds may not have been expended for Gradsky's personal needs is of no consequence. See Barbara M. Bailey, 52 T.C. 115 (1969), and Geiger's Estate v. Commissioner, 352 F. 2d 221 (C.A. 8, 1965), where it was held that the incidence of taxation does not depend on the use of the funds in question for the taxpayer's personal needs. It is sufficient that he is the "force and fulcrum" which control the disposition of the funds. In the light of the foregoing, we hold that the funds in question are taxable income to petitioners. Issue 3. Casualty Loss ($900) Petitioner claimed a deduction of $900 on his return for the taxable year 1962 which respondent disallowed for lack of substantiating evidence. Section 165 of the 1954 Code allows as a deduction any loss, including *256 a loss by theft, sustained during the taxable year and not compensated for by insurance or otherwise. The basis for determining the amount of the deduction is the adjusted basis provided for determining the amount of the deduction provided in section 1011 for determining the loss from the sale or other disposition of property. Section 1.165-7, Income Tax Regs., provides that the amount of the loss to be taken into account for purposes of section 165(a) shall be the lesser of either: (1) the fair maket value of the property immediately before the loss reduced by its fair market value immediately after the loss, which in the case of theft is zero; or (2) the adjusted basis of the property. Considering the paucity of evidence presented on this issue, we must conclude that petitioner has failed to establish the fair market value of the property in question at the time of its loss by theft in December 1962, or that the mink stole was in fact his property. Apart from his testimony that the mink stole cost $1,150 and the watch cost $150, no affirmative evidence was introduced to show the actual cost thereof or the dates of their purchase. Petitioner's income tax *257 636return prepared in 1963 reflects a depreciated value for the mink stole in the amount of $1,000, but does not show the cost thereof. As to the watch, no evidence presented with respect to the type of the watch or its age. Under the circumstances, we cannot ascertain the fair market value of the property involved as of the date of its theft. Moreover, no evidence was introduced as to the ownership of the mink stole. It is reasonable to assume, absent evidence to the contrary, that the stole belonged to Bertha Gradsky and since Harold filed a separate return for the taxable year 1962, he would not be entitled to the deduction under section 165 without proof that the mink stole was his and not the property of his wife. New Colonial Co. v. Helvering, 292 U.S. 435 (1934). In view of the foregoing, respondent is sustained on this issue. Issue 5. Addition to Tax (Sec. 6653(a)) Respondent determined that at least a part of the underpayment in each of the taxable years 1958, 1960, and 1961 was due to negligence orintentional disregard of the rules and regulations and, therefore, that petitioners are liable for additions to tax for such years under section 6653(a) *258 of the 1954 Code. We have found hereinabove that petitioners substantially understated their income in each of 3 years. Also, they have failed to present any convincing evidence which would establish that the understatements were not due to negligence or intentional disregard of the rules and regulations. The presumptive correctness of respondent's determination has not been overcome and, therefore, the additions to tax must be sustained. Marcello v. Commissioner, 380 F. 2d 499 (C.A. 5, 1967), affirming in part a Memorandum Opinion of this Court. Leroy Jewelry Co., 36 T.C. 443 (1961). Finally, the capital loss carryover issues and the medical expense deduction issue will depend on the resolution of the other issues herein and hence will be determined automatically. Due to the concessions of the parties, Decisions will be entered under Rule 50. Footnotes
1. Cases of the following petitioners are consolidated herewith: HAROLD GRADSKY, docket No. 4373-67, and HAROLD GRADSKY and BERTHA GRADSKY, docket No. 4374-67.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
3. FRAUDULENT INTERSTATE TRANSACTIONS. SEC. 17. (a) It shall be unlawful for any person in the sale of any securities by the use of any means of instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly - (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.↩
4. See Cunningham v. Merchants' Nat. Bank, 4 F. 2d 25, 26↩ (C.A. 1, 1925), where the Court summarized a similar method used by Charles Ponzi, a promoter who sold his personal notes to the public at high interest rates and used money from later investors to pay the obligations of earlier investors.