**In re Philip R. COHN, Debtor.**

**Bankruptcy No. 80–00014–G.**

United States Bankruptcy Court,
D. Massachusetts.

Dec. 15, 1982.

James F. Queenan, Jr., Bowditch & Dewey, Worcester, Mass., for plaintiff.

Thomas R. Jones, Tax Div., Northern Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

Daniel E. O'Malley, Springfield, Mass., for debtor.

## MEMORANDUM AND ORDER ON OBJECTION TO CLAIM OF INTERNAL REVENUE SERVICE

PAUL W. GLENNON, Bankruptcy Judge.

The Internal Revenue Service filed a proof of claim for taxes owing by the debt-

or, Philip R. Cohn, for the years 1977 and 1979. The trustee, Robert Y. Murray, filed an objection to the claim. The matter was submitted to the court for decision on a stipulation of facts, exhibits, oral argument and memoranda of law.[1]

## FACTS

Philip R. Cohn ("Cohn"), the debtor, had been engaged in real estate development (primarily in Western Massachusetts) prior to the filing of the involuntary petition. Cohn was initially involved in legitimate land transactions relying principally on banks to provide the necessary financing. At some point, prior to 1977, Cohn turned to individual investors for financing. These initial investors received returns on their investments. Sometime in 1977, and continuing thereafter, Cohn became involved in fraudulent real estate schemes whereby he arranged for individuals to invest in real estate, promising an attractive return on initial investments. Cohn would finance return payments to early investors with money he received from later investors thereby earning a reputation as a real estate "wizard".

More particularly, the fraudulent schemes were of two types. In the first type, "land deals", Cohn received money from investors, promising to purchase land and resell it within approximately six months, and thereby generate a 30 to 50 percent profit on the resale for the initial investors. During the years 1977 through 1979, Cohn received approximately $6,665,000 from investors who participated in the land deals. He subsequently repaid approximately $3,750,000 of the $6,665,000 received.

In the second type of transaction, "HUD deals", Cohn represented to investors that he would use invested funds to purchase real estate projects which were to be financed by the United States Department of Housing and Urban Development ("HUD"). He further represented that any funds received would be held in escrow with HUD, pending approval of an application for HUD financing. If HUD approval was obtained, investors would receive a 100 percent return on their initial investments; if no such approval could be obtained, Cohn would return the funds invested plus interest at the rate of 4½ percent. In fact, Cohn never placed in escrow with HUD any of the funds received by him for HUD deals; nor did he ever make application with HUD for financing. At least $499,000 was received in 1977 and at least $186,000 was received in 1979 from investors in HUD deals. No HUD deal investor ever received any return for his investment.

In both the land deals and the HUD deals, the investments were made in the form of checks payable to either Cohn, or to a sole proprietorship established by Cohn and for which Cohn had sole authority to sign checks. During 1977, 1978, and 1979, in addition to repaying a portion of investors, Cohn used invested funds to pay expenses for his family and for himself, and to repay business loans. At least $150,259.74 was used in 1977 and $1,442,670.15 in 1979, to pay personal and family expenses. At least $3,143,105 was deposited in the account of the sole proprietorship. He also deposited some of the funds in the bank accounts of certain of his companies.

At some point, Cohn became clearly unable to finance the promised returns. He fled to Seattle, Washington and, in an attempt to leave the country, obtained a false Australian passport. Some time later, he turned himself over to the proper authorities and was soon thereafter indicted for larceny in Massachusetts. Cohn has been convicted of numerous counts of larceny and has been serving time in prison for these offenses. The larceny convictions stem from the above-described real estate transactions, directly. Robert Y. Murray ("Murray"), the trustee, has determined

1.  Therefore, the statement of facts, as set forth in this memorandum and order, have been taken from the above-mentioned stipulation and exhibits. The exhibits consist of portions of a deposition taken of Cohn, the transcript of Cohn's guilty plea on charges of larceny, a copy of a larceny indictment to which Cohn pled guilty, and the depositions of two investors taken by the Securities and Exchange Commission.

that Cohn's known assets consist of thirty-one diamonds,[2] Norman Rockwell paintings, Krugerrands, property interests in Marlborough Massachusetts, an interest in a business known as Display Workshop, and proceeds from the sale of Cohn's interests in certain other properties.

On January 8, 1980, three of Cohn's creditors (investors in his fraudulent land schemes) filed an involuntary bankruptcy petition. At present, approximately ninety investors have filed proofs of claim. The claim of the Internal Revenue Service, ("IRS"), if allowed, would consume the available funds in the debtor's estate thereby depriving investors of any recovery. The trustee challenges the claim of the IRS alleging that the money received by Cohn from investors is not taxable income.

For the reasons set forth more fully below, the claim of the IRS must be allowed.

## DISCUSSION

■ It is well settled that loans are not taxable income to the recipient. *See James v. United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961) and 1 J. Mertens, The Law of Federal Income Taxation § 5.12 at 36 (1981). "In the case of bona fide loans, a distinguishing characteristic is that there is an obligation to repay the amount received. Whether such an obligation exists requires a factual determination which it is often difficult to make. All secondary facts which are relevant to the determination of the primary question may be considered." Mertens, *supra.*

In applying the above law to the facts, courts have repeatedly held that an intent to repay and an intent to be repaid are of great importance. "Whether a certain transaction constitutes a loan for income tax purposes is a factual question involving several considerations, but a distinguishing characteristic of a loan is the intention of

the parties that the money advanced be paid". *Moore v. United States,* 412 F.2d 974, 978 (5th Cir.1969). "An essential element is whether there exists a good-faith intent on the part of the recipient of the funds to make repayment and a good-faith intent on the part of the person advancing the funds to enforce repayment." *Irving D. Fisher,* 54 T.C. 905, 909–910 (1970). Intent has been defined as "whether under all the particular facts and circumstances there was a reasonable expectation of repayment in light of the economic realities of the situation." *Id.* "It is likely that every embezzler and some swindlers justify their actions to themselves by convincing themselves that they intent [sic] to return or repay the illegally obtained funds. Since thought or 'plans' do not cause the illegally obtained funds to be 'loans', such a rationalization is not even an intention to repay as the term is used in determining whether an amount received by an individual is a loan. At most the recipient of illegal funds has some vague hope that he will replace or repay the amount illegally obtained." *Rozelle McSpadden,* 50 T.C. 478, 489 (1968). *See also Charles R. Leaf,* 33 T.C. 1093 (1960), *aff'd,* 295 F.2d 503 (6th Cir.1961).

Furthermore, the form of the transaction is not controlling. "Ostensibly, the fact that the taxpayer cast his transactions in the form of loans cannot render the money received therefrom any less taxable than amounts obtained outright by fraudulent means which clearly constituted taxable income.... [S]ubstance controls over form and taxation is concerned with actual command over the property taxed." *Harold Gradsky,* 29 T.C.M. 625, 635 (1970), *aff'd,* 452 F.2d 417 (5th Cir.1971).

The United States Supreme Court, in *James v. United States, supra,* set forth a standard for determining the taxability of

---

2. At this time, twenty diamonds remain unaccounted for. Cohn admits he purchased fifty-one diamonds and offers an explanation for their disappearance. The efforts of Murray to verify Cohns explanation have been unsuccessful. Their value, however, is not of an amount which, if recovered, would provide a benefit to the investors beyond the claim of the IRS. The whereabouts of the missing diamonds are therefore unimportant to the instant memorandum and order.

unlawful gains [3] while specifically recognizing that true loans are not to be taxed.

When a taxpayer acquires earnings, lawfully or unlawfully without the consensual recognition, express or implied, of an obligation to repay and without a restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." In such case, the taxpayer has "actual command over the property taxed—the actual benefit for which the tax is paid". This standard brings wrongful appropriations within the broad sweep of "gross income"; it excludes loans. *Id.* 366 U.S. at 219, 81 S.Ct. at 1055 (citations omitted).

■ This "consensual recognition" standard requires a determination of the intent of Cohn. No other measurement has been provided by the courts following the *James* case. No other measurement would be effective; no other measurement would provide the standard necessary to distinguish transactions. The trustee argues that to determine "consensual recognition" by examining the intent of Cohn would "open a Pandora's box" and require an examination of the intent of every individual entering into a transaction labelled a loan. This argument is unsound. Each case must necessarily turn on its own facts. I cannot overlook the facts that Cohn misappropriated great sums of investors' money to pay family expenses; that Cohn invested much of the money in gold, diamonds, real estate and paintings; and that Cohn fled to the West Coast and was planning to flee to Australia. These facts do not evidence a consensual recognition of an obligation to repay. *See United States v. Rochelle,* 384 F.2d 748, 749 (1967) ("is money obtained from a swindle taxable income to the swindler? We hold that it is. And it makes no difference if the swindle is in the form of a loan and the 'lenders' so beguiled that they really believe they made bona fide loans". *Id.* at 749. The court continued by stating: "Where the loans are obtained by fraud, and where it is apparent that the recipient recognizes no obligation to repay, the transaction becomes a 'wrongful appropriation [and comes] within the broad scope of 'gross income'" (citation omitted). *Id.* at 751.), *Rutkin v. United States,* 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833 (1951) [4], and *Bradley v. Commissioner,* 57 T.C. 1 (1971).

The trustee argues, in the alternative, that if intent is to be examined, Cohn's intent to repay can be found. His business dealings prior in time to those relevant to the instant decision were quite legal. The land deal and HUD deal instruments, plainly on their face, provide for repayment to investors. Further, Cohn stated at the guilty plea hearing on larceny charges in the Hampden County Superior Court that: "I never intended to take it for my own use, per se, no", and that his intent was to repay the investors.

---

3. In furtherance of the recognized policy to subject unlawful income to the tests of taxability, "the courts have held [taxable], gains from illicit traffic in liquor, race track bookmaking, card playing, unlawful insurance policies, illegal prize fight pictures, lotteries, graft, extortion, embezzlement, theft, sale of forged stock certificates, misapplied monies of a client by an attorney, and fraudulently acquired property, 'protection payments', ransom money and prostitution .... Gains from black-market dealings in currency [also] constitute taxable income." 1 Mertens, *supra,* § 411 at 16 (footnotes omitted) and § 6A.13 at 74.

4. The trustee argues that the case of *In re Diversified Brokers Company,* 487 F.2d 355 (8th Cir.1973) should be controlling. In that case, where money was fraudulently obtained by a corporation, the court deemed the transactions to be, in fact, loans because substantial sums were subsequently repaid, with interest, upon demand, and because sufficient funds were available to the corporation to repay the investors. The court further held that there was no taxable income until the time that individual officers of the corporation embezzled money from the corporation. I do not find that case persuasive as it is clear that the corporation did enter into true loan agreements and any intent to defraud was that of the officers who embezzled the funds from the corporation. Any tax liability was thus that of the officers.

I am not so convinced; I do not find Cohn had an intent to repay. The past business history of Cohn, although conceivably relevant in considering the criminal charges brought against Cohn, is not relevant to his intent in receiving the funds of the land deal and HUD deal investors during the time period in question. Neither is the fact that he repaid some investors; for, if he did not repay the original investors, it is not likely that others could have been enticed by his scheme. Similarly, were the relevant documents to be devoid of any promise to repay, Cohn likely would not have received any funds. It would be a rare individual who would freely give his money to Cohn without any type of promise of repayment. Finally, Cohn's statement at his guilty plea hearing may be controverted by his statement at his deposition, i.e., in response to the question "you were telling them [the investors] it was safe when you knew that all the money coming in was just paying off other investors?" Cohn replied "That's correct."

In holding the transactions to be taxable transactions, I am not without sympathy for the unfortunate investors who are general unsecured creditors in this case and are therefore subordinated to the priority tax claim. However, as stated in *U.S. v. Rochelle, supra* at 752 n. 5, "[i]t is for Congress and not the Courts, to determine priorities in both taxation and Bankruptcy. Since Congress has decided that taxes shall have first priority in Bankruptcy, it is their decision and not [mine] that the United States shall take all and the other claimants nothing." *See also In re Diversified Brokers, Co., supra,* at 359 (Stephenson, J. dissenting). This is also the answer to any demand for equitable subordination which might be made under Bankruptcy Code § 510(c). See *In re Bellucci,* 24 B.R. 493, 497–98 (Bkrtcy.D.Mass.1982).

Therefore, in accordance with the foregoing memorandum, the claim of the IRS is ALLOWED in full.