Pearl A. Orenduff v. Commissioner.
Orenduff v. Commissioner
Docket No. 969-66.
United States Tax Court
T.C. Memo 1971-267; 1971 Tax Ct. Memo LEXIS 66; 30 T.C.M. (CCH) 1146; T.C.M. (RIA) 71267; October 18, 1971, Filed. Pearl A. Orenduff, pro se, 812 West 10th St., Bonham, Tex.Robert S. Leigh, for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in the individual income tax liability of petitioner as follows: Year
Deficiency
1956
$ 108.98
1957
16,179.46
1958
65,081.24
1959
62,246.30
1960
1,791.78
*68 Due to concessions by the respondent, subsequent to the close of the pleadings, [1] that the amount of petitioner's receipts from oil operations in 1957 and that the amounts of petitioner's unreported net profit from oil operations in 1958 and 1959 were smaller than those stated in the statutory notice, a Rule 50 computation of the deficiencies and ad valorem penalties will be necessary. 1147 Petitioner filed no income tax returns during the taxable years 1956 through 1960. Accordingly the respondent asserted the penalties for those years for failure to file and for failure to pay an estimated tax under sections 6651 and 6654, I.R.C. 1954, [2] respectively, and additionally the negligence penalties under section 6653(a), which we tabulate below: Additions
to the Tax
Sec.
Sec.
Sec.
Year
6651(a)
6654
6653(a)
1956
$ 27.25
$ 5.45
1957
4,044.87
449.06
808.97
1958
16,270.31
1,818.30
3,254.06
1959
15,561.58
1,737.86
3,112.32
1960
447.95
44.13
89.59
*69 Petitioner places the deficiencies and the penalties in issue and denies that she filed no returns for the years 1956-1960. In addition petitioner [3] alleges that the respondent was barred from issuing the deficiency notice due to his failure to prosecute any claim for unpaid taxes as an ordinary creditor in prior bankruptcy proceedings; we decide this issue only to the extent it impinges on our disposition of the case. Petitioner alleges that the notice of deficiency was mailed to an address other than the most recent address known to the respondent and that the notice is defective therefor. The hearing was conducted by James M. Gussis, Commissioner of the United States Tax Court, on January 19-23, 1970. For the reasons stated in our opinion, we adopt the proposed findings of fact contained in the Tax Court Commissioner's Report to the Chief Judge given below: Findings of Fact Some of the facts were stipulated and they are so *70 found. Petitioner and her husband, Monroe Orenduff, were residents of Bonham, Texas at the time the petition and the amended petition herein were filed. Petitioner did not file Federal income tax returns for any of the years 1956 through 1960. From 1937 to about October 1955, petitioner and her husband resided in Sherman, Texas where she taught English and other courses at Austin College and assisted her husband in operating a retail jewelry store. Petitioner had received a Bachelor of Arts degree and a Master of Arts degree at Austin College prior to her marriage in 1937 and she also did postgraduate work toward a Ph.D. at Columbia University in New York City. Petitioner's husband filed individual Federal income tax returns for each of the years 1956 through 1960, which returns did not include any income or expenditures from petitioner's oil operations. Prior to 1955 petitioner became interested in the potential development of oil properties. She made an intensive study of petroleum geology although she had no formal training in this field. In October 1955, petitioner acquired from C. C. Long an oil and gas lease covering approximately 741 acres of land in Rogers County, Oklahoma. *71 She engaged the services of J. L. McGee, an engineer with long experience in Oklahoma oil operations, who went to Sherman, Texas, to meet petitioner's friends and acquaintances who had expressed an interest in participating in the lease. Petitioner agreed to make assignments of fractional interests from her 7/8ths working interest in the Long lease to interested investors. The investors agreed to pay their shares of well completion costs and operating expenses. In October 1955, petitioner moved to Claremore, Oklahoma, where she subsequently established an office and residence at the Will Rogers Hotel. She designated her new business venture as the Orenduff Oil Operations. Four wells were drilled under McGee's supervision on the Long property. The first three were abandoned without production. After these three wells were drilled, the petitioner assumed full management and responsibility for spotting other locations and drilling other wells. Although oil was found in the fourth well, the Long lease was never commercially productive. Petitioner's method of operation was to purchase oil and gas leases or to lease tracts of land or mineral rights in various areas and then sell fractional *72 interests of her working interests to third parties who would pay from $1,000 to $5,000 for a 1/32 working interest. Petitioner would acknowledge receipt of the money with a letter or statement. In some instances the petitioner would agree to pay the purchaser of the fractional interest a certain percentage of the oil and gas production obtained, and 1148 in the event that such percentage of oil and gas production did not equal within one year the amount of the purchase price paid for the fractional interest, the petitioner would in some instances agree to pay the difference to the purchaser. Purchasers of fractional interests were also required to provide additional funds to petitioner from time to time for costs incurred in completing the wells. Petitioner was active during the period here relevant in contacting individuals in various parts of the United States in order to obtain funds for the development of her oil-producing operations. In addition to the acquisition of the Long lease in 1955, the petitioner acquired interests in the following leases in several Oklahoma counties during the years 1956 through 1960: Gibson, Dowell, Kulchinski, Wells, Andrews, Boyd, Bothwell, *73 Hopp, McMahan, Poorman, Flippin, Hall, McLearan, Long Brothers, Orenduff and Dotson. Petitioner also acquired or negotiated for following leases during this same period: Thompson, Tennessee Project, Perkins, Gaddy, Baumer, Wells (Tulsa), Hanes, Orr, Roberts, Green Talala Project, Production Project and McGee. Petitioner drilled wells during the period here involved on approximately 15 of the above leases acquired by her. On December 23, 1956 petitioner and her husband entered into a contract with J. I. Taylor for the purchase of a residence in Tulsa, Oklahoma. The purchase price was $55,000 payable $1,000 down, a first mortgage loan of $30,000, a trade-in of a residence at 3349 South Fulton (which had a first mortgage of $7,000 and an equity of $9,500), a second mortgage of $7,000 payable monthly over 60 months, and $500 in cash. The sale took place on April 23, 1957 for a purchase price of $50,088.34 payable as follows: Down payment
$ 1,000.00
Mortgage note to C. C. Long
30,000.00
Second mortgage note to Adams Bldg. Corp.
$10,000
Less discount for not trading in other real estate
5,000
5,000.00
Check of Pearl A. Orenduff down on account of Orenduff Oil
14,088.34
Operations with First National Bank, Braman, Oklahoma,
made payable to J.I. Taylor
Total
$50,088.34
*74 Petitioner's obligation of $14,088.34 was subsequently paid by a check to J. I. Taylor in the amount of $14,090.34. About August 1956, petitioner mailed to various participants in her oil ventures a summary of her oil activities in Oklahoma. With respect to the Kulchinski lease the petitioner estimated total primary and secondary recovery (as per Core Laboratories) in the amount of $2,942,026.50. In reporting on the Bothwell lease the petitioner indicated that there was no reason to believe that its value would be less than her estimated value on the Kulchinski lease. Petitioner acquired the oil and gas lease on the McMahan property in 1957 and, as in the case of all her leases, petitioner made numerous assignments out of her working interest in this lease in exchange for payments from participants. This lease was eventually canceled by McMahan through legal action. W. J. McDanel and a group of his friends from Pennsylvania agreed to provide funds for the development of the McMahan lease. In 1958 the petitioner sold a 3/32 working interest in the McMahan lease to McDanel for $15,000 and subsequently in the same year sold an additional 3/32 working interest to him for $15,000. *75 At the time of the second sale the petitioner and McDanel entered into an agreement to the effect that the funds would be used to drill and complete 10 wells on the McMahan lease. Petitioner also represented in the agreement that production on the lease would begin by July 1958. Shortly thereafter the petitioner took back a 1/32 interest from McDanel and returned $5,000 to him. At the time McDanel was negotiating with petitioner with respect to acquiring an interest in the McMahan lease, the action brought in the State Court by McMahan to cancel the lease was pending. McDanel was unaware of the pending suit. McDanel subsequently retained Robert J. Woolsey, an attorney in Tulsa, who visited the McMahan lease and concluded that no new wells had been drilled on the property. Woolsey did find 10 wells that had been drilled some time previously and 1149 that they had been in existence at least since 1940. Woolsey also discovered that, contrary to representations made to McDanel by the petitioner, the leases acquired were not within the areas to be flooded by the Oologah Dam reservoir. In 1959 McDanel brought an action against petitioner in the United States District Court for the *76 Northern District of Oklahoma to recover the amounts paid to petitioner on the basis that such amounts had been received by false and fraudulent representations. About September 1959, the parties negotiated a settlement in which petitioner gave her note in the amount of $32,695 to McDanel payable in weekly installments of $750 to $1,000. As of August 1, 1960, petitioner had made total payments of $7,750 on the note. In 1963 McDanel took a new note from petitioner in the amount of $30,000 in satisfaction of the prior note. In 1967 McDanel brought an action in the United States District Court for recovery on the principal of the note plus interest at 6 percent in the total amount of $37,968.87 and obtained a default judgment on July 29, 1968. Production Project 20 (also known as the Ross Trust and the Orndorff Trust) was formed by the petitioner to obtain a group of leases for the development and reworking and possible water flood production in the Oologah Dam area in Northeast Oklahoma. In connection with this project petitioner obtained $118,000, late in 1958, from a group of 27 investors through Harvey H. Orndorff, an investment banker in Chicago, Illinois. Petitioner represented *77 to Orndorff that she needed the funds to acquire and develop leases in the Oologah Dam area so that, with the fruition of a purported Federal dam project in the area, the condemnation proceeds - based upon established oil reserves on the leases that would be ostensibly lost by the flooding - would provide a profit to the investors. The Orndorff investors did not receive from petitioner any assignments of fractional interests in leases. When Orndorff learned that petitioner had not used the amount of $118,000 to acquire leases in the Oologah Dam area, he questioned petitioner in May 1959 and was unable to obtain any satisfactory accounting. Petitioner used the funds to acquire and develop leases in other sections of Oklahoma. Petitioner also used the funds for many personal expenditures including (1) a payment of $912.50 to C. C. Long on her house note; (2) a payment to Long's Carpet in the amount of $665.95; (3) a loan repayment of $40,000; (4) a payment of $1,346 to Lou Gibbon Furs; and (5) a payment of $633.42 to the Central Church of Christ in Baton Rouge, Louisiana. Orndorff then requested the return of the amount of $118,000 plus interest from petitioner. When petitioner failed *78 to comply several of the Orndorff investors filed a suit against petitioner and obtained judgment for the amounts involved. In a subsequent involuntary bankruptcy action involving petitioner in 1961, the investors in the Orndorff group filed claims for at least $118,000. On or about April 6, 1959, petitioner acquired an oil and gas lease from Minnie Tyner Flippin on a 160 acre tract of land in Tulsa County, Oklahoma. After petitioner had drilled a well on the Flippin lease which was producing in excess of 50 barrels an hour, she was advised by John B. Adams of Washington, D.C. that he would invest $100,000 in order to develop the Flippin lease. On June 8, 1959 the petitioner, Adams, and one Banks L. Smith of Indian Head, Maryland, entered into an operators' agreement for drilling, development and production on the Flippin lease. Adams and Smith were each assigned 30 percent of the 7/8ths working interest while petitioner had the remaining 40 percent of the 7/8ths working interest. Also on June 8, 1959, a collateral agreement was executed under which Smith agreed to advance $50,000 for development purposes on the Flippin lease. The agreement provided for a collateral assignment to *79 Smith of production from the Flippin lease and further provided that the amount advanced by Smith would be repaid out of production within one year. The collateral agreement was signed by Adams and the petitioner. Smith actually advanced only $47,000 to petitioner. Petitioner used $38,900 out of the $47,000 to purchase a residence in Bixby, Oklahoma. The residence was purchased by petitioner in the name of one Bernice Springall who was petitioner's nominee. Smith then brought an action against petitioner on the ground that petitioner had fraudulently diverted the funds advanced by him. As part of a settlement reached by the parties, the petitioner assigned her interest in the Flippin lease to Adams. On August 10, 1959, Smith assigned his interest in the Flippin lease to Adams and on the same day Adams gave a mortgage on the lease to Smith as security for the payment to Smith of the amount of $47,000, plus interest at 5 percent. 1150 On or about December 10, 1960 the petitioner, on the advice of counsel, assigned her remaining interests in the Long, Gibson, Kulchinski, Wells, Andrews, Boyd, Bothwell, Hopp, McMahan and Poorman leases to J. I. Pitchford as trustee for the operation *80 of the properties. Petitioner notified the participants in the oil and gas leases of the assignment. Pitchford, in a letter dated January 26, 1961, informed the investors of the current status of the leases and after stating that the "files which were turned over to us are far from complete," indicated that efforts would be made to place the various leases into production. On July 5, 1961 petitioner was adjudicated a bankrupt in an involuntary bankruptcy proceeding which was commenced by certain of petitioner's creditors in April 1961, in the United States District Court for the Northern District of Oklahoma. Unsecured creditors filed proofs of claim in the bankruptcy proceeding in the aggregate amount of $218,971.39. Respondent did not file a proof of claim in the bankruptcy proceeding. Many of the participants in the various leases and projects did not file proofs of claim in the bankruptcy proceedings. On May 16, 1962 a discharge was granted in the bankruptcy proceedings with respect to petitioner. In March 1963, a creditor of the petitioner filed a petition to revoke petitioner's discharge in bankruptcy on the ground that petitioner's conduct in withholding records constituted *81 a crime within the meaning of 18 U.S.C. sec. 152. After a hearing, the referee in bankruptcy determined that the discharge of the bankrupt was obtained through fraud and accordingly revoked the petitioner's discharge in bankruptcy. The order revoking such discharge was affirmed by the United States District Court for the Nothern District of Oklahoma. In Re. Orenduff, 226 F. Supp. (1964). On January 8, 1965 the United States District Court for the Northern District of Oklahoma promulgated its order approving the account of the trustee discharging the trustee and closing the bankruptcy estate. Petitioner did not maintain books and records which were sufficient to reflect her income from her oil operations during the period from 1955 through 1960. Her records for this period are fragmentary. Substantial portions of petitioner's records have been missing for at least 10 years. During the years 1956 to 1960 it was petitioner's practice to deposit in various bank accounts the amounts received from investors or participants and to pay both business and personal expenses from these accounts by check. Petitioner also used receipts to pay expenses directly without depositing *82 such amounts in bank accounts and subsequently writing checks for the expenses. On October 15, 1956 petitioner opened a checking account with the Rogers County Bank, Claremore, Oklahoma. Deposits were made in this bank account in 1956 in the aggregate amount of $28,858.23, as follows: October 15
$ 3,000.00
October 19
5,000.00
October 25
192.02
November 16
18,000.00
November 17
2,525.00
November 21
141.21
$28,858.23
As of November 30, 1956 the bank account became inactive with a balance of $33.94. During the years 1956 to 1960 petitioner maintained a business and personal bank account in the name of her husband, Monroe Orenduff, with the Rogers County Bank of Claremore, Oklahoma. Deposits in this account during these years were in the following aggregate amounts: 1956
$ 970.30
1957
4,854.39
1958
28,145.93
1959
12,481.25
1960
1,008.87
On February 9, 1957 petitioner opened an account with the First National Bank of Braman, Oklahoma in the name of Orenduff Oil Operations to deposit money obtained as a loan on her rigs and other assets. The account was active for a few months and was closed on July 24, 1957. Deposits in this *83 account during this period were in the aggregate amount of $134,690.95. During the year 1957 petitioner opened three checking accounts with the First National Bank and Trust Co., Tulsa, Oklahoma, in the names of Pearl A. Orenduff, Trustee; Pearl A. Orenduff, Special; and Monroe or Pearl A. Orenduff Deposits were made in these accounts during 1957 in the following aggregate amounts: Pearl A. Orenduff, Trustee, $12,165; Pearl A. Orenduff, Special, $21,798.71; and Monroe or Pearl A. Orenduff, $6,303.96. These three accounts were closed in 1957. On November 20, 1958 petitioner opened a checking account with the National Bank 1151 of Tulsa, Tulsa, Oklahoma. Deposits were made to this account during the years 1958, 1959 and 1960 in the aggregate amounts of $107,689.75, $134,441.23, and $5,654.64, respectively. During the years 1957, 1958, 1959 and 1960, petitioner received income from oil sold to F. A. Helms and to Helms and Beckham in the following aggregate amounts: $9,085.56, $2,422, $10,523.15 and $6,736.30, respectively. Such income was received for petitioner's and other participants' shares of oil production from the Gibson, Wells, Boyd, Dowell, Andrews, Kulchinski, Bothwell, *84 Flippin and Hopp leases, all of which were located in Nowata, Rogers and Tulsa counties, Oklahoma. In the absence of adequate books and records reflecting petitioner's income for the years 1956 through 1960 from her oil operations the respondent reconstructed her taxable income for said years on the basis of deposits and withdrawals in the First National Bank of Braman, Oklahoma, the National Bank of Tulsa in Tulsa, Oklahoma, the First National Bank and Trust Company in Tulsa, Oklahoma, and the Rogers County Bank of Claremore, Oklahoma. The respondent also included in petitioner's income the receipts from oil sales to Helms and Beckham during this period and income in the form of a bank draft purchased with currency at the First National Bank of Braman, Oklahoma in 1958 in the amount of $8,550.25. Respondent eliminated from income any identifiable deposits from nontaxable sources such as loans and transfers. Adjustments were made for withdrawals that were identified as business expenditures. Such adjustments were made for both current business expenditures and expenditures that were capital in nature, such as the cost of lease acquisitions and the purchases of rigs and other equipment. *85 Respondent allowed as business expenses petitioner's re-acquisitions of working interests in her various leases if the original purchase price paid by the investors for such working interests had previously been included in income. Respondent's determination of deficiencies in the statutory notice of deficiency (dated December 1, 1965) for the years 1956 through 1960 was based upon the above reconstruction of income. Subsequent to a pre-trial conference held by this Court on April 16 and 17, 1968 and pursuant to this Court's instructions, the respondent conducted an exhaustive reexamination which covered many records not previously available to him. In connection with his reexamination, the respondent analyzed the numerous bank accounts, deposit slips, canceled checks, invoices, correspondence and legal documents made available to him by the petitioner. He also obtained information from these parties concerning petitioner's business activities. The following schedule shows respondent's reconstruction of petitioner's receipts from her oil operations as originally determined in the statutory notice of deficiency and as subsequently computed by respondent in his reexamination, based *86 only on the bank accounts and the income items that were considered by him in the determinations made in the statutory notice of deficiency: BANK DEPOSITS
Helms &
Beckham
First Nat'l.
Nat'l. Bank
Year
(Oil Sales)
Bank-Braman
Tulsa
1956
Not. of Def.
$ 660.74
$0
$0
Reexamination
660.74
0
0
1957
Not. of Def.
9,085.56
47,688.41
0
Reexamination
9,085.56
70,497.21
0
1958
Not. of Def.
3,427.04
0
102,997.90
Reexamination
2,422.51
0
107,689.75
1959
Not. of Def.
10,523.15
0
135,711.76
Reexamination
10,523.15
0
111,211.07
1960
Not. of Def.
6,892.66
0
2,482.14
Reexamination
6,892.66
0
3,027.63
BANK DEPOSITS
First Nat'l.
Rogers
Bank & Trust
County
Bank
Total
Bank
Year
co. Tulsa
Claremore
Drafts
Receipts
1956
Not. of Def.
$0
$ 959.73
$0
$ 1,620.47
Reexamination
0
29,828.56
0
30,489.30
1957
Not. of Def.
24,943.90
4,722.44
8,550.25
94,990.56
Reexamination
35,622.10
4,654.39
0
119,859.26
1958
Not. of Def.
0
26,983.33
0
133,408.27
Reexamination
0
27,615.83
0
137,728.09
1959
Not. of Def.
0
1,658.28
0
147,893.19
Reexamination
0
10,970.95
0
132,705.17
1960
Not. of Def.
0
0
0
9,374.80
Reexamination
0
0
0
9,920.29
*87 1152 The following schedule shows respondent's reconstruction of petitioner's allowable business expenses (including expenditures that were capital in nature) as originally determined in the statutory notice of deficiency and as subsequently computed in the reexamination, based only on the bank accounts and the income items that were considered in the statutory notice of deficiency: First Nat'l.
First Nat'l.
Nat'l. Bank
Bank & Trust
Year
Bank-Braman
Tulsa
Co. Tulsa
1956
Not. of Def.
$0
$0
$0
Reexamination
0
0
0
1957
Not. of Def.
47,562.81
0
8,361.31
Reexamination
34,411.28
0
17,815.33
1958
Not. of Def.
0
28,621.31
0
Reexamination
0
30,921.31
0
1959
Not. of Def.
0
52,521.82
0
Reexamination
0
61,034.57
0
1960
Not. of Def.
0
1,242.27
0
Reexamination
0
1,206.21
0
Bank Drafts
Rogers
Purchased
County Bank
Not Otherwise
Year
Claremore
Allowed
Total
1956
Not. of Def.
$ 521.17
$0
$ 521.17
Reexamination
13,297.01
0
13,297.01
1957
Not. of Def.
902.90
2,636.30
59,463.32
Reexamination
847.39
0
53,074.00
1958
Not. of Def.
6,423.18
0
35,044.49
Reexamination
13,657.74
0
44,579.05
1959
Not. of Def.
310.10
0
52,831.92
Reexamination
7,514.96
0
68,549.53
1960
Not. of Def.
0
0
1,242.27
Reexamination
0
0
1,206.21
*88 The following schedule summarizes the reconstruction of petitioner's net profit from her oil operations as originally determined by respondent in the statutory notice of deficiency and as subsequently recomputed by him in the reexamination, based only on the bank accounts and items of income that were considered in the statutory notice of deficiency: Notice of
Reexami-
Year
Deficiency
nation
1956 Taxable receipts
$ 1,620.47
$ 30,489.30
Less allowable expenses
521.17
13,297.01
Net profit from oil operations
1,099.30
17,192.29
1957 Taxable receipts
94,990.56
119,859.26
Less allowable expenses
59,463.32
53,074.00
Net profit from oil operations
35,527.24
66,785.26
1958 Taxable receipts
133,408.27
137,728.09
Less allowable expenses
35,044.49
44,579.05
Net profit from oil operations
98,363.78
93,149.04
1959 Taxable receipts
147,893.19
132,705.17
Less allowable expenses
52,831.92
68,549.53
Net profit from oil operations
95,061.27
64,155.64
1960 Taxable receipts
9,374.80
9,920.29
Less allowable expenses
1,242.27
1,206.21
Net profits from oil operations
8,132.53
8,714.08
Respondent does not claim any increased deficiencies *89 for the years 1956, 1957 and 1960. Respondent concedes that petitioner's receipts from her oil operations in 1957 should be reduced by the amount of $8,550.25, which was included in respondent's reconstruction of petitioner's income in the statutory notice of deficiency as the amount of bank drafts purchased with currency in 1957 from the First National Bank of Braman, Oklahoma. Respondent concedes that petitioner's unreported net profit from 1153 her oil operations in 1958 should be reduced from $98,363.78 (as originally determined in the statutory notice of deficiency) to $93,149.04. Respondent also concedes that petitioner's unreported net profit from her oil operations in 1959 should be reduced from $95,061.27 (as originally determined in the statutory notice of deficiency) to $64,155.64. In the course of his reexamination, the respondent was informed by petitioner that she had maintained bank accounts during the years in question in at least four banks in addition to those in the four banks considered by the respondent in his initial reconstruction of petitioner's taxable income which formed the basis of his original determinations. The additional banks were (1) the M. and *90 P. National Bank in Sherman, Texas, (2) the Victory National Bank (Nowata), (3) the First National Bank (Claremore) and (4) the Fourth National Bank (Tulsa). Pursuant to this Court's instructions at the pre-trial conference the petitioner prepared a schedule of her deposits and disbursements in the accounts of the eight banks and the analysis was made available to the respondent in the course of his reexamination. After an item by item analysis of petitioner's schedule, the respondent prepared a schedule showing income and allowable expenses in the following amounts: Accounts in the four banks originally
considered
Business
Income
Expenses
1956
$ 8,828.56
$24,491.80
1957
111,959.38
53,109.52
1958
135,305.58
50,814.56
1959
122,232.02
74,896.95
1960
4,136.50
1,942.17
Accounts in the four banks subsequently
disclosed by petitioner
Business
Income
Expenses
1956
$189,598.88
$146,321.87
1957
27,356.86
12,452.26
1958
43,239.38
30,851.18
1959
375.00
0
1960
0
0
Respondent does not claim any increased deficiencies for any of the years here involved based upon the increases in petitioner's taxable income for the years *91 1956 through 1959 as revealed by the analysis of the accounts in the four new banks (the M. and P. National Bank; the Victory National Bank; the First National Bank (Claremore); and the Fourth National Bank (Tulsa)). Opinion We have had no difficulty determining that the findings of fact made by the Commissioner of the Tax Court and incorporated in this opinion, to which the respondent has no objection, are supported by the record and evidence. Petitioner failed to file exceptions to the findings of the Tax Court Commissioner within the time limit, as she was required to do under Rule 48(f), Tax Court Rules of Practice. Further, from our examination of the record and exhibits we are satisfied that petitioner did not carry her burden of proving that specific bank deposits were attributable to sources which made them excludable from gross income, or that she was entitled to specific deductions. Petitioner was not represented by counsel at trial, and her presentation consisted of a lengthy chronology of her activities in the oil drilling business. This case is governed by settled principles of law. Petitioner's records of income and expenses of her business enterprise for the taxable *92 years in issue were either inadequate or in a state of dispersion, although it was incumbent upon her to maintain records from which her tax liability could be accurately determined. Section 6001. Under these circumstances, the respondent was entitled to use any reasonable method to reconstruct gross income, and in this case used the bank deposit method. [4] U.S. v. Ramsdell, - F. 2d - (C.A. 10, 1971).
The respondent was entitled to determine that those bank withdrawals that could not be linked to a specific invoice or other indication that a business purpose was involved represented nondeductible personal expenditures, and that the amount of a deposit should be considered gross income unless a specific nontaxable source could be identified. Petitioner has the burden of proving the amount of her income and allowable deductions. Rule 32; Rogan v. Blue Ridge Oil Co., 83 F. 2d 420, 423 (C.A. 9, 1936), cert. denied 299 U.S. 574. The respondent properly treated as gross income the funds which petitioner received from *93 sales to investors of fractional oil lease interests and diverted to her personal use. 1154 United States v. Rochelle, 384 F. 2d 748 (C.A. 5, 1967), cert. denied 390 U.S. 946; Commissioner v. Glenshaw Glass, 348 U.S. 426 (1955); Rutkin v. United States, 343 U.S. 130, 137 (1952). Petitioner argues that the respondent was required to pursue claims for the asserted income tax deficiencies as an ordinary creditor in bankruptcy, and that as the respondent failed to do this he is concluded by the petitioner's discharge in bankruptcy. We consider those arguments only to the extent they pertain to our disposition of this case. Congress has invested the Tax Court with the power to redetermine deficiencies which are properly before it, sec. 6213(a), and the manner in which the respondent pursued the instant claims in the bankruptcy proceedings has no bearing on our duty to render a decision. In an earlier decision of this Court denying the respondent's motion to dismiss this case for lack of jurisdiction, we held that the jurisdiction limiting provisions of section 6871(b) do not apply to the precise sequence of proceedings in this case *94 before the Federal District Court sitting in bankruptcy and this Court. Pearl A. Orenduff, 49 T.C. 329, 332 (1968). That decision, of course, is law of the case and petitioner in essence is now attempting to reargue it. We know of no statute enacted by Congress in case law which supports petitioner's position. No statute of limitations bars determination of a deficiency for the taxable years in question because petitioner filed no returns for those years. Sec. 6501(c)(3). We need not discuss the legal consequence of the alleged failure to mail the notice of deficiency to the petitioner's last known address as directed by section 6212(b)(1), since petitioner offered no evidence that she informed the respondent of a new address before the deficiency notice was mailed to her Kansas City, Missouri address on December 1, 1965. We doubt that there was a legal wrong even if petitioner had proved this fact, since petitioner filed her petition within the 90-day limit and thus was not prejudiced by the alleged defect in the statutory notice. Massengale v. Commissioner, 408 F. 2d 1373 (C.A. 4, 1969), affirming a Memorandum Opinion of this Court. Petitioner is clearly *95 liable for the three penalties asserted by the respondent. We have already disposed of her contention that she owed no tax, and as she has no other excuse for her failure to file income tax returns she must pay the section 6651 penalty. In view of the virtual absence of recordkeeping, petitioner is also liable for the penalty imposed by section 6653(a) for negligence or intentional disregard of the income tax rules and regulations. Tehan v. Commissioner, 295 F. 2d 895 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court [Dec. 24,330(M)]. The section 6654(a) penalty is properly imposed since petitioner paid no taxes from 1956 through 1960, although she was required to pay a quarterly estimated tax under the provisions of sections 6015(a)(2) and 6153 then applicable. Decision will be entered under Rule 50. Footnotes
1. Although the respondent's amendment to his answer, filed May 5, 1970, adumbrates these concessions, the prayer is that we approve the deficiencies as they are asserted in the statutory notice.↩
2. All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.↩
3. We treat petitioner's amended petition as her entire pleadings as it appears to be a verbatim reproduction of the unsigned original petition.↩
4. See also Paul J. Frederick, 16 T.C.M. 1022↩, 1023, T.C.M. 1957-225, appeal dismissed for want of prosecution (C.A. 7, 1959).