W. R. McDANIEL and GEORGINA McDANIEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McDaniel v. Commissioner
Docket No. 8270-74
United States Tax Court
T.C. Memo 1977-256; 1977 Tax Ct. Memo LEXIS 185; 36 T.C.M. (CCH) 1037; T.C.M. (RIA) 770256; August 8, 1977, Filed W. R. McDaniel, pro se. Charles H. Cowley, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in Federal income tax of petitioners as follows: Taxable Year
Amount
1969
$96,230
1971
2,439
1972
7,951
Due to concessions the only issue remaining for our decision is whether $160,191.10 obtained by W.R. McDaniel from the Summers brothers' partnership is includible in petitioners' income pursuant to section 61, Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and supplemental stipulation of facts and attached exhibits are incorporated herein by reference. *186 Mr. and Mrs. McDaniel (petitioners) were husband and wife and resided in Idaho Falls, Idaho, when their petition was filed herein. Petitioners filed joint Federal income tax returns with the Western Regional Service Center, Ogden, Utah, for the taxable years 1969, 1971 and 1972. Subsequent to the filing of the petition herein, petitioners filed amended joint Federal income tax returns for the taxable years 1969, 1971 and 1972. In 1968 Mr. McDaniel contacted Mr. Roy Summers of Sugar City, Idaho, to negotiate a purchase of potato crops from Mr. Summers and his two brothers, Frank and Bert Summers. The Summers brothers are potato farmers in Idaho and operate their farming business as a partnership. Mr. McDaniel contacted the Summers brothers and represented that they could defer recognition of income from a portion of their 1968 potato crop if they would sell the crop to him under a contract calling for payment three years from the date of the actual sale. Mr. McDaniel and his attorney, Keith Jergensen, convinced the Summers that they could defer the recognition of income by explaining Revenue Ruling 58-162. [2] Pursuant to the discussion Mr. McDaniel and the Summers *187 brothers entered into an agreement dated March 1, 1969, whereby the Summers brothers agreed to sell the 1968 potato crop to Mr. McDaniel with the purchase price for the potatoes to be paid on March 20, 1971. On August 1, 1969, the parties agreed upon a purchase price of $160,000. The agreement called for the creation of a trust under the name of AAMDICO with Mr. McDaniel acting as trustee. Mr. McDaniel promised to pay the Summers brothers $160,000 plus a 20 percent interest in "something." Mr. McDaniel told Roy Summers that the agreement could not reflect any additional interest (the additional 20 percent interest) in the purchase price because to do so would disqualify the deferral of income. *188 The potato crop was transferred to the trust under the direction of Mr. McDaniel. On July 10, 1969, the Summers brothers sold a portion of the transferred potatoes to R. Belso Co. and received $136,801.50. The Summers brothers sold the balance of the potato crop to Muir-Roberts Co. on November 10, 1969, for a purchase price of $23,384.60. When the initial payment from the sale to R. Belso Co. was received, Mr. Roy Summers, Mr. McDaniel and Mr. Jergensen flew to Bozeman, Montana, to deposit the check in an account styled, "W.R. McDaniel, trustee for AAMDICO." The payment from the sale of the remaining potatoes was also deposited in the same account at the direction of Mr. McDaniel. The Summers brothers paid Federal income tax on the sale of the potatoes in 1969 because the Commissioner issued a statutory notice of deficiency to them in which he determined that they had constructively received the proceeds from the sale of the potatoes in 1969. Mr. McDaniel was involved in the business of real estate sales and development during the taxable years in question. The trade name, AAMDICO, was a name he personally used in conducting such business activity. This business activity *189 (AAMDICO) was not incorporated at the time the potatoes were transferred nor has it been a corporation at any time since. In addition, Mr. McDaniel conducted business under the name of Yellowstone Development Co. which was never incorporated. On July 10, 1969, the same day the initial payment from the sale of potatoes was deposited in the AAMDICO account, Mr. McDaniel drew a check from this account in the amount of $10,000, payable to Yellowstone Development Co. (operating account). On September 5, 1969, Mr. McDaniel entered into an agreement with Destination, Inc., whereby Destination, Inc. as sole shareholder of Destination Enterprises, Inc. (D.E.I.) [3] would sell to Mr. McDaniel all of the D.E.I. stock for a purchase price of $150,000 and other stock owned by Mr. McDaniel. Mr. McDaniel as trustee of AAMDICO placed $125,000 in an escrow account with Mr. Jergensen acting as escrow agent. The money ($125,000 was to be released to Destination, Inc. and the stock (D.E.I.) delivered to Mr. McDaniel upon payment of the final $25,000. Mr. Jergensen could not release the $125,000 to Destination, Inc. until he obtained approval from Roy Summers. This restriction was pursuant to the *190 purchase agreement of which Mr. Summers was not a party. Further, Mr. Summers knew nothing of the agreement, the restriction, or the plan for the purchase of the D.E.I. stock. On September 12, 1969, Roy Summers signed a release of all remaining funds ($126,790) in the AAMDICO trust account in a document which provided for $125,000 to be released to Mr. Jergensen and $1,790 to be released to W.R. McDaniel. Mr. Summers signed the release upon the instructions of Mr. McDaniel who explained to Mr. Summers that the release was necessary under the requirements of Revenue Ruling 58-162. Subsequently, Mr. Jergensen distributed the $125,000 to Destination, Inc. and the D.E.I. stock was transferred to Mr. McDaniel in his name. Mr. McDaniel continued to carry on business during the taxable years in question using the proceeds from the sale of the potatoes to promote the real estate development in Montana. The proceeds from the November 10,1969, sale ($23,384.60) were used in the operation of Yellowstone Development Co. Mr. Summers was not aware of *191 these activities and received nothing from the efforts of Mr. McDaniel in the form of stock or other interest in the business operations. He did not sign a release of the $23,384.60 used by Mr. McDaniel in his business activities. Mr. Summers made inquiries into Mr. McDaniel's activities but to no avail. When the payment of $160,000 case due on March 20, 1971, Mr. Summers made a demand for payment but Mr. McDaniel would not pay. On July 28, 1971, Mr. McDaniel entered into an agreement with Mr. A. Grover Gifford, president of Destination, Inc. Under this agreement, Mr. Gifford agreed to buy all outstanding shares of D.E.I. from Mr. McDaniel who warranted in the agreement that he was owner of D.E.I. stock in fee simple and that the stock was held by him free from any incumbrances. Mr. Gifford agreed to assume all debts owed to the Summers brothers. The agreed purchase price was $955,000. The stock was placed in escrow by Mr. McDaniel with Mr. Jergensen as escrow agent. Mr. Jergensen would hold the D.E.I. stock until Mr. McDaniel received the total purchase price. Pursuant to the agreement, Mr. Gifford made a $20,000 down payment to Mr. McDaniel. Subsequently, Mr. Gifford defaulted *192 and all rights and obligations he had flowing from the contract with Mr. McDaniel terminated. The termination resulted in Mr. McDaniel's retention of the D.E.I. stock plus the receipt of $20,000. This amount was reported as income by Mr. McDaniel in the amended return for 1972 which was filed subsequent to the filing of the petition in the instant case. The D.E.I. stock remained in the possession of Mr. Jergensen and Mr. McDaniel continued to seek purchasers for the stock. In 1972 Mr. McDaniel and Destination Enterprises, Inc., filed bankruptcy petitions under the Bankruptcy Act. Pursuant to those proceedings, the Summers brothers submitted a bid in the amount of $245,000 for the real estate (resort property in Montana) held by Destination Enterprises, Inc. The bid was received and accepted by the referee in bankruptcy on February 12, 1973. Subsequently and at the conclusion of the bankruptcy proceedings, the Summers brothers, as creditors, received $44,600 in discharge of their $160,191.10 claim against Mr. McDaniel. While the bankruptcy proceedings were still pending (sometime in 1973) Mr. McDaniel, for the first time, offered a portion of D.E.I. stock to the Summers brothers. *193 This offer was made without approval from the referee in bankruptcy and at a time Mr. Jergensen held the stock as escrow agent. The transfer of stock was not consummated. The Commissioner, in his statutory notice of deficiency, determined that petitioners realized taxable income in 1969 in the amount of $160,191.10 because Petitioner W. R. McDaniel had unrestricted use of the proceeds from the sale of potatoes owned by the Summers brothers in that amount. Further, the Commissioner determined that because Petitioner W.R. McDaniel did not discharge any obligations to the Summers brothers and did not intend to do so, the unrestricted use of $160,191.10 in 1969 constituted taxable income. OPINION Petitioners take the position that they intended to pay the Summers brothers $160,191.10 plus a 25 percent interest in Yellowstone Development Co. on the agreed date, March 20, 1971. However, due to financial difficulties beyond their control they were unable to do so. They argue that the agreed price for the 1969 potato purchase was a debt which could not be satisfied as demonstrated by the bankruptcy proceedings. Respondent contends that Petitioner W.R. McDaniel obtained $160,191.10 *194 from the Summers brothers in 1969 and exercised complete control over it by purchasing stock in his own name with a portion of the funds. Respondent further contends that Petitioner W.R. McDaniel never paid or offered to pay the $160,191.10 to the Summers brothers and, further, that he did not intend to repay the Summers brothers. Therefore, respondent argues that the $160,191.10 received by Mr. W.R. McDaniel under his personal trade name of AAMDICO in 1969 constitutes income to him in that year. The sole issue before us is whether $160,191.10 obtained by Mr. W.R. McDaniel from the Summers brothers is includible in petitioners' income under section 61. The law is settled that when a taxpayer acquires funds, either lawfully or unlawfully, with no intent to repay and with no restriction as to the disposition of the funds, he has received income which he must report even though he has no right to retain the funds and even though he may be adjudged liable to restore its equivalent. James v. United States,366 U.S. 213 (1961). In such a situation, the taxpayer has command over the funds and receives a benefit of the funds for which the tax is paid. Therefore, a *195 wrongful acquisition of funds with no intent to repay comes within the definition of gross income. Conversely, a loan is excluded from the broad sweep of section 61. It, in itself, does not constitute income to the borrower because the benefit he derives from the use of the funds is temporary and is offset by the obligation to repay. McSpadden v. Commissioner,50 T.C. 478 (1968). United States v. Rochelle,384 F.2d 748 (5th Cir. 1967). When a loan is obtained by fraud and where it is apparent that the recipient recognizes no obligation to repay, the transaction becomes a wrongful appropriation within the definition of gross income. James v. United States,supra.
In the instant case Mr. McDaniel obtained funds ($160,191.10) in 1969 from the Summers brothers, pursuant to an agreement with them and with the understanding that Mr. McDaniel would repay the funds plus 20 percent interest in "something" on March 20, 1972. The agreement did not include a recitation of the added 20 percent interest. Mr. McDaniel explained that to include this "something extra" in the agreement would be in violation of Revenue Ruling 58-162, *196 the inducement for the Summers brothers to enter into the agreement. A portion of the funds ($10,000) was immediately used by Mr. McDaniel in the operation of his real estate development scheme, the Yellowstone Development Co. Mr. Roy Summers was unaware of this transfer of funds. In September 1969 at the direction of Mr. McDaniel, Mr. Roy Summers signed a release which enabled Mr. McDaniel to obtain further use of funds on hand in the AAMDICO trust. Mr. McDaniel explained to Mr. Summers that the release was necessary to gain the desired deferral of income from the sale of potatoes. Again, Mr. Summers was unaware of Mr. McDaniel's intention to purchase the D.E.I. stock. Once the release was signed Mr. McDaniel purchased D.E.I. stock from Destination, Inc. The stock was issued in the name of W.R. McDaniel. The balance of the funds from the sale of the potato crop was used by Mr. McDaniel to operate under the trade name, Yellowstone Development Co. As time progressed Mr. McDaniel refused to inform the Summers brothers of his activities despite their numerous inquiries. On March 20, 1971, Mr. McDaniel refused to discharge his obligation under the agreement with the Summers brothers. *197 Subsequently, Mr. McDaniel offered to sell his D.E.I. stock to Mr. A. Grover Gifford for $955,000.Mr. Gifford paid $20,000 to Mr. McDaniel as a down payment. However, Mr. Gifford defaulted. The down payment was retained by Mr. McDaniel and all rights and obligations Mr. Gifford had under the agreement terminated. Mr. McDaniel continued to seek a purchaser for the stock but was unable to find one. It was not until the petition in the instant case was filed that Mr. McDaniel reported the $20,000 down payment in his amended return for 1972. The fact that Mr. McDaniel could characterize his agreement with the Summers brothers as a loan (the repayment of $160,000 plus 20 percent in something) cannot be conclusive of its substantive nature. The actions and misrepresentations of Mr. McDaniel demonstrate not only his lack of intent to repay the funds, but also the unrestricted use and benefit he derived from the proceeds. See United States v. Rochelle,supra;Marks v. United States,391 F.2d 210 (9th Cir. 1968); Potito v. Commissioner,534 F.2d 49 (5th Cir. 1976), affg. a Memorandum Opinion of this Court. The fact that the *198 Summers brothers received $44,600 pursuant to the bankruptcy proceedings does not diminish the necessity to include $160,191.10 as gross income for the taxable year 1969, for it was in 1969 that Mr. McDaniel exercised unrestricted use and control of the funds. Moreover, it was in 1969 that the first of many misrepresentations were made to the Summers brothers with respect to Mr. McDaniel's intent to repay the funds. Yerkie v. Commissioner,67 T.C. 388 (1976); James v. United States,supra.
Accordingly, we hold that the amount of $160,191.10 received by Mr. McDaniel in 1969 from the Summers brothers was obtained under false pretenses and that he exercised unrestricted control over the funds and had no intention of repaying them to the Summers brothers. Therefore, under section 61 the $160,191.10 is includible in petitioners' income for the taxable year 1969. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. Rev. Rul. 58-162, 1958-1 C.B. 234, deals with the deferral of income of proceeds from the sale of wheat by a farmer using the cash receipts and disbursements method of accounting under a bona fide arm's-length contract calling for payment in the taxable year following that in which the wheat was delivered to the purchaser. Under these circumstances, Rev. Rul. 58-162↩ allows the proceeds from the sale to be includible in the farmer's gross income for the taxable year in which payment is received.
3. Destination Enterprises, Inc. owned real estate in Montana which was held for the purpose of developing a resort area.↩